[No. B045330. Second Dist., Div. Three. June 12, 1991.]

DuBARRY INTERNATIONAL, INC., Plaintiff and Respondent, v. SOUTHWEST FOREST INDUSTRIES, INC., Defendant and Appellant.

**COUNSEL**

Sidley & Austin, William F. Conlon, Cynthia A. Gray and William C. Ryan for Defendant and Appellant.

Daniels, Baratta & Fine, Nathan B. Hoffman and Michael B. Geibel for Plaintiff and Respondent.

**OPINION**

**CROSKEY, J.**—Defendant and appellant Southwest Forest Industries, Inc. (Southwest) appeals the judgment entered following a jury verdict, awarding plaintiff and respondent DuBarry International, Inc. (DuBarry)[1] $1,502,604 in damages for breach of an exclusive agency agreement, $1,502,604 for

---

[1]Although DuBarry is technically a corporation, it appears that it is entirely owned by and operated by A. P. "Pete" DuBarry and was the vehicle for the conduct of his business as a broker for certain paper products manufacturers. As a matter of convenience and clarity, we will use the term DuBarry to refer to him in his individual capacity.

bad faith denial of the existence of such agreement, and $3.8 million in punitive damages.

While the damage award for breach of contract must be affirmed, we conclude that (1) a duplicative award of compensatory damages was made and (2) the award of punitive damages was improper because there was no legal or factual basis for concluding that tortious misconduct had occurred. In reaching this latter conclusion we necessarily examine the tort recognized by the Supreme Court's decision in *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 769-770 [206 Cal.Rptr. 354, 686 P.2d 1158], and find that its limited scope will not support DuBarry's claim. We therefore will modify the judgment by striking both the duplicative compensatory damages and the entire award of punitive damages. As so modified, the judgment will be affirmed.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

The record, when viewed in accordance with settled principles of appellate review (*Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38, 44 [248 Cal.Rptr. 217]), establishes the following facts.

In the fall of 1981, Southwest was a producer of linerboard, pulp and newsprint. Castle & Cooke owned Dole Packaged Foods and was a substantial purchaser and consumer of linerboard such as that produced and sold by Southwest. Castle & Cooke utilized that product to make the corrugated boxes in which its food products were shipped. It was Castle & Cooke's practice to purchase linerboard from at least two different suppliers.

Southwest, eager to become a supplier to Castle & Cooke, decided to retain DuBarry as a broker. Southwest was aware that DuBarry had a close

---

[2] Several weeks after oral argument, the parties informed us that they had reached a settlement in this matter and jointly sought this court's consent to an order dismissing the appeal. Although such a stipulation might ordinarily end the matter, we nevertheless, in this case, have determined that the appeal should go forward. Apart from its discretionary authority under California Rules of Court, rule 19(b), a reviewing court has inherent discretion to resolve issues of continuing public interest, even though those issues may have become moot in the particular case before it. (*Abbott Ford, Inc.* v. *Superior Court* (1987) 43 Cal.3d 858, 868, fn. 8 [239 Cal.Rptr. 626, 741 P.2d 124]; *Okuda* v. *Superior Court* (1983) 144 Cal.App.3d 135, 137, fn. 1 [192 Cal.Rptr. 388].) The instant case, like many others now pending in our courts, involves a claim of tort liability under *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.*, *supra*, 36 Cal.3d at pp. 769-770. DuBarry contends that there should be such tort liability for any defense asserted in bad faith to a cause of action for breach of contract. Such a broad reading of *Seaman's* raises an important issue which has received inconsistent treatment in the appellate decisions. It thus deserves our review, despite the parties' willingness to dismiss the appeal.

relationship with Henry Cassity (Cassity), Castle & Cooke's director of purchasing. After some initial discussions, James M. Russell (Russell), Southwest's linerboard sales manager, and DuBarry, on September 3, 1981, exchanged several telexes which the trial court ultimately determined to constitute the exclusive agency contract. As found by the court, the agreement provided that DuBarry would be the exclusive representative of Southwest for all Kraft linerboard sales to Castle & Cooke for up to one year on spot shipments and for the period covered by any contract between Southwest and Castle & Cooke. DuBarry would receive a 3 percent commission based on FAS value of all sales which DuBarry consummated with Castle & Cooke, without deduction for freight, handling or transportation charges.[3]

On the same date, September 3, 1981, upon authorization by Russell, DuBarry telexed to Castle & Cooke an offer for a long-term contract to supply linerboard as follows:

"Term of contract: Five (5) years.

"Quantity: Up to 60,000 tons/year.

"Pricing: FAS Gulfport (yellow sheet[4] less

$20/ton). FAS Panama City (yellow sheet less $35/ton)."

---

[3]Russell's initial telex to DuBarry provided:

"This confirms our exclusive arrangements with you for the handling of shipments to Castle and Cooke for a contract extablished [sic] within 60 days."

DuBarry responded "Our legal advisor finds your telex ambiguous. Would u please resend it as follows:

"Southwest Forest Industries grants DuBarry International, Inc. the exclusive right to represent it for all Kraft linerboard sales with the Castle and Cook[e] Company of San Francisco. DuBarry International, Inc. will receive a 3 per cent sales commission on the FAS value of all sales it consummates with Castle and Cook[e], whether on a 'spot' basis or a 'contract' basis. DuBarry International, Inc. will invoice Castle and Cook[e] on a direct basis."

Russell responded with a return telex, modifying the proposed language as follows: "Southwest Forest Industries grants DuBarry International, Inc. the exclusive right to represent it for all Kraft linerboard sales with the Castle and Cook[e] Company of San Francisco up to one (1) year on spot shipments or for the period covered by a contract. DuBarry International, Inc. will receive a three (3) percent commission on sales value less freight and FAS charges it consummates with Castle and Cook[e], wheather [sic] on a 'spot' basis or 'contract' basis. . . ."

DuBarry accepted, sending the telex: "Reurtlx, we accept basic conditions, provided that our 3 pct commission is based on FAS value of the shipment, without deductions for FGT and FAS charges. . . .

"If this is agreeable with you, pls confirm by return telex, and I will immediately send u specs for the first order."

[4]The "yellow sheet" was a periodic industry publication setting forth current market prices for a variety of paper products including linerboard.

After some further exchanges and discussions, DuBarry, in December 1981, relayed additional proposals to Castle & Cooke as requested by Southwest. Castle & Cooke indicated it was only interested in delivery at Gulfport, while Southwest preferred Panama City. Pursuant to Southwest's instructions, DuBarry requested a response from Castle & Cooke to the various proposals by January 8, 1982. At Cassity's request, DuBarry telexed a duplicate copy of the September 3, 1981, offer, counterdated January 8, 1982. This offer was submitted with the consent of Southwest.

On January 8, 1982, Castle & Cooke accepted the September 3 offer, stating, "Castle & Cooke accepts in principal [sic] your offer on behalf of Southwest Forest Industries a five-year contract with tonnages up to 60,000 tons/year with pricing as indicated in your letter dated Sept. 3, 1981 and counter-dated Jan. 8, 1982. [¶] Although C&C may require some spot tonnage in the first quarter of 1982,[5] it would be C&C's intent to purchase at reasonably even increments under the proposed agreement beginning April 1, 1982." DuBarry communicated this acceptance to Southwest the same day.

The parties (DuBarry; Russell and Russell's superior, Mike Fallaw (Fallaw), of Southwest; and Cassity and Paul Sink of Castle & Cooke), met on February 9, 1982, and finalized the details of the agreement. Delivery was to be at Gulfport. The quantity the first year would be "approximately 20,000 S. Tons with following years to be accelerated as C&C's volumes increase." Pricing would be FAS Gulfport, "yellow sheet" less the discount of $20.00 a ton. Other details were agreed upon. Southwest was to draft a contract in accordance with the "offer/acceptance agreement."

However, instead of drafting a contract in accordance with those discussions, Fallaw, shortly thereafter, wrote Cassity a letter, stating, "Based on your letter setting forth the terms, there could be some misunderstanding, and I would like to clarify." The letter explained that Southwest had believed it could "work an arrangement with Castle and Cooke that would permit shipment from . . . Panama City, Florida. Since this is not possible we are attempting to secure long term fixed rate committments [sic] to move tonnage to Gulfport. . . ."

The letter also stated that Southwest's contracts all specify "SWF announced price" not "Yellow Sheet."

---

[5]In the fall of 1981, Castle & Cooke had ordered three spot shipments of linerboard from Southwest. DuBarry received his commission for these sales without deduction for freight, handling or transportation charges. Those sales are not at issue in this appeal.

On March 31, 1982, Cassity, who apparently regarded this as an indication that Southwest was trying to renegotiate the deal agreed to on February 9, 1982, sent the following communication to Fallaw: "Due to material changes in the original proposal that you have made and the length of time lapsed in bringing together an agreement, Castle and Cooke terminates this matter as submitted and considers all previous correspondence 'null and void' . . . ." As a result, there was no long-term contract entered into between Southwest and Castle & Cooke.

On June 2, 1983, DuBarry filed a complaint against Southwest for breach of written contract and for interference with prospective economic advantage. In its verified answer,[6] Southwest denied the material allegations, including the allegation that Southwest employed DuBarry to act as its exclusive agent to sell Kraft linerboard to Castle & Cooke. DuBarry responded with an amended complaint in which he added a cause of action for bad faith denial of contract.

Both parties filed motions for summary judgment and summary adjudication. The trial court made the following adjudication of issues: (1) A valid agency contract existed between DuBarry and Southwest; (2) DuBarry was Southwest's exclusive agent for linerboard sales to Castle & Cooke from September 3, 1981 until after March 1, 1982; (3) On or about January 8, 1982, DuBarry transmitted an offer on behalf of Southwest to sell linerboard to Castle & Cooke; and (4) Southwest did not tortiously interfere with any business relationship between DuBarry and Castle & Cooke or any prospective economic advantage of DuBarry.[7]

After a trial of the remaining issues, the jury returned a special verdict, finding that "by its telex of January 8, 1982, Castle and Cooke intended to accept the offer transmitted by DuBarry on behalf of [Southwest]." The special verdict form stated, "If you answer 'yes' to Question No. 1 [regarding acceptance], then you shall find that a contract existed between Castle and Cooke and [Southwest]." The form then stated, "2. What amount is

---

[6]The answer was verified by Southwest's counsel pursuant to Code of Civil Procedure section 446. That section provides, in pertinent part: "When the verification is made by the attorney for the reason that the parties are absent from the county where he or she has his or her office, or from some other cause are unable to verify it, or when the verification is made on behalf of a corporation or public agency by any officer thereof, the attorney's or officer's affidavit shall state that he or she has read the pleading and that he or she is *informed and believes* the matters therein to be true and *on that ground* alleges that the matters stated therein are true. *However, in those cases the pleadings shall not otherwise be considered as an affidavit or declaration establishing the facts therein alleged.*" (Italics added.)

[7]As a result of this determination there remained only two theories of recovery asserted by DuBarry: (1) breach of contract and (2) bad faith denial of contract.

DuBarry entitled to recover as damages for breach, if any, of the agency agreement between [Southwest] and DuBarry?" The jury awarded DuBarry $1,502,604. It also found that Southwest had denied in bad faith the existence of the agency agreement and that "the denial of the contract [was] the legal cause of loss or damages" in the amount of $1,502,604. Finally, after further proceedings, the jury deliberated on the issue of punitive damages, and rendered a verdict in the amount of $3.8 million.

Southwest filed a notice of intention to move for judgment notwithstanding the verdict and a new trial or, in the alternative, for a remittitur. However, due to a scheduling error by the court clerk, the motion was never heard and was deemed denied by operation of law because it was not resolved within the required 60-day period (Code Civ. Proc., § 660).

## ISSUES

Although we do not articulate the issues in the same manner as the parties, our perspective does reach the essential substantive claims of error which have been presented and argued. In our view, the issues upon which this appeal turns can best be analyzed in the context of the damages awarded by the trial court and they are three in number.

1. Did the trial court properly conclude that an exclusive agency agreement existed and that DuBarry was entitled to damages for its breach?

2. Were duplicative compensatory damages awarded to DuBarry?

3. On the evidence presented, was there any legal or factual basis for an award of punitive damages to DuBarry?

## DISCUSSION

1. *There Was an Exclusive Agency Agreement and DuBarry Was Entitled to Compensatory Damages for Its Breach*

Although Southwest does not here contest the existence of the agency agreement,[8] it does dispute the meaning and construction of its terms. Southwest contends that the trial court "committed reversible error in instructing the jury to find for DuBarry 'if there was a contract between Castle & Cooke and Southwest for the purchase of linerboard,' without requiring

---

[8]Indeed, in view of the trial court's summary adjudication of that issue, it was not disputed at trial.

proof of consummated sales." The basis of this contention is the proposition that the "clear contract language" required "consummation of sales," and "as a matter of law" (*Cochran* v. *Ellsworth* (1954) 126 Cal.App.2d 429, 439-440 [272 P.2d 904])[9] required *performance* of the sales contract between Southwest and Castle & Cooke. As already noted, no such sales ever took place.

Contrary to Southwest's contention, the agency agreement between DuBarry and Southwest did *not* condition DuBarry's commission upon the performance of the sales contracts between Southwest and Castle & Cooke. The language of the agreement granted DuBarry the exclusive right to represent Southwest for "all Kraft linerboard sales with the Castle and Cook[e] Company of San Francisco." DuBarry was to receive a commission "on the FAS value of all sales [*DuBarry*] consummates with Castle and Cook[e] . . . ."[10] (Italics added.)

The term "consummate" as used in this agreement is not clear and free from ambiguity. Thus, the trial court was entitled to consider extrinsic evidence. In this case, DuBarry testified that Russell and he understood that "consummate" meant "the point at which a buyer accepts the offer tendered to him by the seller." Fallaw, who did not participate in the negotiations between Russell and DuBarry regarding the agency arrangement, testified initially that, in the industry, the term "consummate" meant "arrangement," and then, ". . . that an agreement was made, that a sale moved forward and tonnage was shipped, paid for." Upon this conflicting evidence, the trial court's interpretation, which was consistent with one reasonable meaning of the term, was proper and is affirmed. (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747 [131 Cal.Rptr. 873, 552 P.2d 1169].)

[9]*Cochran* v. *Ellsworth, supra,* 126 Cal.App.2d 429, concerned a real estate broker's commission. Unlike the "usual type" of broker's agreement, whereby the commission is earned when a purchaser is procured by the broker even if the sales contract is not performed, (*id.,* at p. 438), the broker's agreement in the *Cochran* case provided " 'in the event of consummation of the sale' a commission was to be paid . . . ." (*Id.,* at p. 439.) The court held, "Without regard to the extrinsic evidence . . . the words 'consummation of the sale' have a reasonably well defined meaning under the law. First of all, they refer to a future event, not to an obligation immediately arising upon execution of the instrument here in question. [Citation.] Secondly, the cases clearly hold that 'consummation of the sale' means completion of the transaction, and where real property is involved, payment of the purchase price and conveyance of title. [Citation.] The word 'consummate' means 'to bring to completion.' " (*Id.,* at p. 440.)

[10]This is the language of DuBarry's September 3 telex to Russell. The language in Russell's return telex changed the basis of the commission by deducting both freight and FAS charges. Both versions, however, provide for a commission on sales contracts DuBarry "consummates with Castle & Cook[e]," not upon the consummation or complete performance of sales between Southwest and Castle & Cooke. This interpretation is also consistent with Southwest's initial telex to DuBarry for "our exclusive arrangements with you for the handling of shipments to Castle and Cooke for a *contract extablished* [*sic*] within 60 days." (Italics added.)

The jury specifically found that by its January 8, 1982, telex, Castle & Cooke intended to accept Southwest's offer as transmitted by DuBarry. This finding is supported by substantial evidence, including the telex itself and confirming testimony. Pursuant to the California Uniform Commercial Code, a partial requirements contract was formed at that point, even though (1) terms of the offer and acceptance differed and specific details were not finalized (Cal.U. Com. Code, §§ 2204, 2207; *Steiner* v. *Mobil Oil Corp.* (1977) 20 Cal.3d 90, 99, 105 [141 Cal.Rptr. 157, 569 P.2d 751]) and (2) Southwest acted subsequently to avoid the agreement by seeking to modify the terms. Once DuBarry consummated this deal, he was entitled to his commission.[11] The jury found the amount of such commissions to be in the sum of $1,502,604.

■ The evidence offered by DuBarry was sufficient to justify that award. Damages for breach of contract must be clearly ascertainable. (Civ. Code, § 3301.) However, where the *fact* of damage has been established, the precise *amount* of the damage need not be calculated with absolute certainty. "As long as there is available a satisfactory method for obtaining a reasonably proximate estimation of the damages, the defendant whose wrongful act gave rise to the injury will not be heard to complain that the amount thereof cannot be determined with mathematical precision. [Citations.]" (*Noble* v. *Tweedy* (1949) 90 Cal.App.2d 738, 746 [203 P.2d 778]; see also, *Mann* v. *Jackson* (1956) 141 Cal.App.2d 6, 12 [296 P.2d 120]; *Allen* v. *Gardner* (1954) 126 Cal.App.2d 335, 340 [272 P.2d 99]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 823, pp. 741-743.)

The evidence presented to the jury in this case was sufficient to provide a reasonable basis for calculating the amount of DuBarry's commissions. An agreement had been reached as to a specific market price for the linerboard based on a periodic industry publication. In addition, it was undisputed that, at a meeting to finalize the details of the purchase agreement, which was held on February 9, 1982, Castle & Cooke committed to purchase from Southwest 20,000 tons during the first year (i.e., 1982) "with following years to be accelerated as Castle & Cooke's volumes increase." The evidence also established that Castle & Cooke's actual purchase of linerboard from other suppliers during that five-year period in fact exceeded 60,000 tons per year. Even though Castle & Cooke's agreement with Southwest was only a partial requirements contract, such evidence was sufficient to provide a basis for the

---

[11]Because DuBarry's agency agreement did not require complete performance of the linerboard sales between Southwest and Castle & Cooke, it is unnecessary for us to address the issue raised by Southwest as to whether there was sufficient evidence of Southwest's bad faith prevention of performance, an exception to the requirement of transaction consummation applied in *Cochran* v. *Ellsworth, supra,* 126 Cal.App.2d 429.

lost commission calculations, based on three different possible sales scenarios, presented by DuBarry's expert. Depending on what assumptions were made regarding the amount of linerboard that Castle & Cooke would have purchased from Southwest during said five-year period, the total commissions payable to DuBarry could have been less or substantially more than the amount actually awarded. The jury had all of this evidence before it and the matter was fully argued. We cannot conclude that the jury's determination of $1,502,604 as the amount of DuBarry's lost commissions was either unreasonable or unsupported by substantial evidence.

### 2. *The Damage Award for Bad Faith Denial of the Agency Contract Was Duplicative of the Award for Breach of That Contract*

The record is clear that the *only* evidence offered by DuBarry as to damages was that relating to his lost commissions. As already noted, the jury, after considering that evidence, found that the amount of those commissions was in the sum of $1,502,604. Southwest contends that the judgment improperly awarded an additional $1,502,604 as damages for the bad faith denial of the agency agreement. Southwest argues that such award was improper as duplicative of the damages already assessed for breach of contract. We agree.

Civil Code section 3300 provides, in pertinent part, "For the breach of an obligation arising from contract, the measure of damages, . . . is the amount which will compensate the party aggrieved for *all* the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Italics added.) The jury was properly instructed in accordance with this rule.

There is nothing in this record to suggest that the jury was in any way misled or confused by such instructions or that it failed to follow them. We thus reject DuBarry's contention that "other than the fact the numbers are the same, there is no evidence in the record of double recovery." Such argument misapprehends the significance of the jury's determination on the contract claim. There was no evidence offered by DuBarry of any damages *other* than lost commissions. Such loss was fully compensated by the damage award for breach of contract. We cannot agree with DuBarry's suggestion that since the damage evidence would have supported a verdict higher than $1,502.604,[12] the jury could well have awarded one-half of the total damages on each cause of action. Such a conclusion requires us to assume that the jury

---

[12]As already noted, it also would have supported a verdict in a lower amount.

ignored the clear instructions it had been given. This we cannot do. (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 63 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; *Palmer v. Ted Stevens Honda, Inc.* (1987) 193 Cal.App.3d 530, 536 [238 Cal.Rptr. 363].)

That DuBarry based his case on two separate causes of action does not necessarily mean that he was entitled to receive a separate damage award for each. ■ " 'If a given state of facts entitles one to recover damages upon the theory of tort, and the same state of facts entitles him to recover upon the theory of contract, it would seem plain that recovery could not be twice had simply because the facts would support recovery upon either theory.' " (*Shell v. Schmidt* (1954) 126 Cal.App.2d 279, 291 [272 P.2d 82], quoting from 2 Freeman on Judgments (5th ed. 1925), § 583, p. 1235.) We do not quarrel with the proposition that DuBarry might, in some circumstances, be entitled to recover separate damages on his two causes of action. They do involve, after all, alleged invasions of different rights. However, in this case the *only* damage evidence offered related to lost commissions. There was no attempt to show that Southwest's alleged bad faith denial of the agency contract's existence had caused DuBarry any damages beyond those already claimed for the breach of that contract.[13] Obviously, the jury itself recognized this problem. During deliberations it submitted the following question to the court:

"Question 4 on the verdict form[14] asks if [Southwest's] bad faith denial of the agency agreement (if we so decide) is the legal cause of DuBarry's loss or damages. Does this mean damages over and above loss of commission, or does this include any loss of commissions which we may have found already as damages in response to question 2 on the verdict form?"

The court answered this question simply, "It includes any loss of commission."[15] The jury, already having determined DuBarry's loss of commission

---

[13]Without citing specific examples, it is clear that upon proof of a tortious invasion of his rights, DuBarry would have been entitled to rely upon the broader measure of damages set out in Civil Code section 3333.

That section provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." However, in this case there were no such additional consequential damages claimed or proven which might reasonably be recognized as part of a legitimate tort recovery.

[14]Question 4 on the verdict form read, in relevant part, ". . . was Southwest Forest Industries' denial of the contract the legal cause of loss or damage to DuBarry?"

[15]Prior to giving this answer the court conferred with counsel in chambers, but the discussion was not reported; thus we do not have the benefit of the arguments or discussions which took place relative to the clarity or even propriety of this answer.

in some amount, was told that the same damage standard applied to the bad faith denial claim. This simply invited the jury to award the same damages twice.[16]

When the jury verdict was announced in open court, Southwest did not question or ask for clarification or correction of the jury's award. However, there was no compelling reason for it to do so. Clarification was not required as there was nothing unclear or ambiguous about the verdict. Similarly, correction was not appropriate as there was nothing to correct; the verdict was entirely consistent with the trial court's response to the jury's inquiry.[17] The jury had, in effect, been told that each cause of action had the same measure of damage and it simply made a finding which reflected obedience to that instruction.

It was not until the court later entered the judgment that it became apparent that Southwest would be required to pay the same damages twice. Southwest moved to correct this error in a timely motion for a new trial. However, the court failed, due to its own scheduling error, to consider or rule upon such motion within the required 60-day period. The motion was therefore deemed denied. (Code Civ. Proc., § 660.)

As the jury's award of breach of contract damages constituted a finding as to the total of DuBarry's lost commissions, and since those were the *only* damages he claimed, the award for the alleged bad faith denial of contract was duplicative as a matter of law. It was therefore improper and cannot stand.[18]

3. *There Was No Legal or Factual Basis for a Recovery in Tort and Punitive Damages Were Therefore Improper*

It is settled that punitive damages may not properly be recovered in a contract action. (Civ. Code, § 3294, subd. (a); *Frazier* v. *Metropolitan Life Ins. Co.* (1985) 169 Cal.App.3d 90, 106 [214 Cal.Rptr. 883].) Thus, if there

---

[16]The trial court would have been better advised to make an explicit instruction that duplicate damages could not be awarded. Indeed, it had a duty to do so. (*Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 760, fn. 13 [250 Cal.Rptr. 195].)

[17]In any event, a failure to raise an objection to a jury's verdict does not always result in a waiver; some element of negligence or culpability must appear. "Waiver is not found where the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy.'" (*Woodcock* v. *Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456, fn. 2 [72 Cal.Rptr. 217, 445 P.2d 881]; see 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 353, pp. 353-354).

[18]We note that this award would also fall for the reasons discussed below where we conclude that there was not substantial evidence that the alleged tort had even been committed.

is no evidentiary support for recovery in tort, then DuBarry must be left to his contract damages. The award of punitive damages,[19] as well as the compensatory damages (even if they were not otherwise improper as duplicative), would be improper.

Here, DuBarry seeks to impose tort liability upon Southwest based on the claim that there was a bad faith denial of the existence of his agency contract. Such a tort theory of recovery was recognized in *Seaman's Direct Buying Service, Inc.* v. *Standard Oil, Co, supra,* 36 Cal.3d 752, 769-770 (*Seaman's*).

a. *Tort Recovery Under Seaman's Requires a Denial of Contract Existence, Not Simply Contract Liability*

In *Seaman's,* the plaintiff sought to enforce a "contract" for a long-term marine fuel supply dealership on which it had relied to its severe detriment. When the oil market dynamics changed following execution of the "contract," the defendant, Standard Oil, did everything in its power to cause the concerned government agencies to deny to Seaman's the required permits and, when that failed, took the position that the "contract" was an unenforceable letter of intent and denied that any contract was ever formed. The evidence produced at trial essentially demonstrated that this position was taken without any factural basis to support it and without a good faith belief that any such factual basis existed.

The Supreme Court rejected the plaintiff's arguments that such conduct constituted a tortious breach of the implied covenant of good faith (*Seaman's, supra,* 36 Cal.3d at pp. 768-769) and instead recognized a new tort which could be asserted in those limited contractual disputes where the defendant has denied, in bad faith, that a contract existed. The elements of this "tort are (1) an underlying contract, (2) which is breached by the defendant, (3) who then denies liability by asserting that the contract does

---

[19]Although not specifically raised by Southwest, a review of the jury instructions reflects that the jury was not instructed as to the definition of "clear and convincing" evidence, the statutory standard of proof now required to establish entitlement to punitive damages. (Civ. Code, § 3294, subd. (a).) One version of such an instruction is contained in BAJI No. 2.62 (7th ed. 1991 pocket pt.) pages 4-5. Although an instruction defining such term is required for all trials commencing after January 1, 1988 (Civ. Code, § 3294, subd. (e)), none was given by the trial court. As the initial (and only) trial of this case commenced on April 4, 1989, it is clear that it was necessary that this term be properly defined for the jury. This court has previously criticized the adequacy of the BAJI instruction. (*In re Marriage of Weaver* (1990) 224 Cal.App.3d 478, 487, fn. 8 [273 Cal.Rptr. 696]. But see *Roberts* v. *Ford Aerospace & Communications Corp.* (1990) 224 Cal.App.3d 793, 804 [274 Cal.Rptr. 139].) Southwest requested a definitional instruction which closely resembled the definition of "clear and convincing" which, in *Weaver,* this court stated should be given.

not exist, (4) in bad faith and (5) without probable cause for such denial." (*Careau & Co.* v. *Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1401 [272 Cal.Rptr. 387] (*Careau*).) It is the burden of a plaintiff to prove each of these elements. Usually, the most troublesome issues involve the last two. "The requirement that the [denial of contract existence] be asserted in bad faith is a *subjective* issue relating to the defendant's state of mind. Stated in its simplest form, it means that the defendant does not have a good faith belief that the facts relied upon constitute or support a legally tenable defense. The . . . absence of probable cause [on the other hand], means that, on the basis of the facts known to the defendant, the assertion of the defense was not legally tenable; that is, it was neither reasonable nor justified under applicable law. This is an *objective* requirement and requires a consideration of all of the circumstances." (*Id.*, at p. 1402.)

However, before these two critical issues are reached there must be evidence that the defendant has in fact *denied the contract's existence*. Disputes as to the terms of a contract or the meaning or legal effect of those terms do not constitute a denial of contract existence. (*Oki America, Inc.* v. *Microtech Intern., Inc.* (9th Cir. 1989) 872 F.2d 312, 314.) Similarly, disputes as to performance or denials of liability, which do not contest the contract's existence, will not justify a tort recovery under *Seaman's*.

DuBarry argues that this construction of *Seaman's* is too strict. He urges that what the court there sought to condemn was the assertion of *any* defense in bad faith. DuBarry argues that the court in *Seaman's* seemed to suggest that a tort remedy would not be inappropriate where "a contracting party [seeks] to avoid all liability on a meritorious contract claim by adopting a 'stonewall' position ('see you in court') without probable cause and with no belief in the existence of a defense. . . . Acceptance of tort remedies in such a situation is not likely to intrude upon the bargaining relationship or upset reasonable expectations of the contracting parties." (*Seaman's, supra,* 36 Cal.3d at pp. 769-770.)[20]

In our view, DuBarry places too much weight on this language. With but minor and now discredited exceptions (see discussion below), "no court has

---

[20]Specifically, DuBarry advances the proposition that "case law provides three examples of a *Seaman's* tort: (1) coercing the other party to pay more or less than is due through the unjustified threat of litigation; (2) false denial that a contract exists; or (3) 'stonewalling' by denying liability without reasonable belief in the existence of a meritorious defense." However, DuBarry is wrong. There is no credible or persuasive California authority which supports a *Seaman's* cause of action on either the first or third of these examples.

recognized such a construction of the *Seaman's* opinion. While it certainly has contributed to some of the confusion and uncertainty which has trailed in *Seaman's* wake . . . , it seems more likely that the discussion of a 'stone-wall defense' . . . was merely a part of the court's rationale supporting its recognition of the new tort of bad faith denial of contract existence." (*Careau, supra,* 222 Cal.App.3d at pp. 1397-1398, fn. 22.)

However, DuBarry's argument necessarily requires a direct consideration of just how strictly *Seaman's* should be construed. Did the *Seaman's* court intend to limit the "new tort" to denial of contract existence or was a broader reach contemplated? The answer to that question has received little judicial consideration.

In *Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877 [208 Cal.Rptr. 394], the court was faced with an attempt by the defendant to declare a contract rescinded based upon an alleged misrepresentation made by the plaintiff. The court concluded that the "*Seaman's* tort" was not implicated by a threat to rescind a contract. The court stated that *Seaman's* did not require examination of conduct in the *performance* of a contract but only whether a denial of contract *existence* had been asserted. (*Id.* at p. 890.) "General and punitive damages may be appropriate judicial sanctions for those who in bad faith deny the contract itself, but may be much less well chosen for those whose fault lies only in having inadequate grounds to challenge contract terms. An unrestricted rule of tort liability for unfair dealing could convert routine contract case [*sic*] into contract-tort jury trials, issues of fact regarding perceived tortious conduct being so easily raised. [¶] Not all contractual facts are crystal clear. The dispute may be to the fact of a meeting of the minds in the first place, or it may be over the meaning of the words used. Inappropriate reliance may be placed on unenforceable oral 'modifications' or 'supplements.' . . . There may be uninformed positions taken, energized by emotions and self-interest." (*Id.* at p. 892.)

A similar restrictive view of *Seaman's* was adopted in *Elxsi* v. *Kukje America Corp.* (N.D.Cal. 1987) 672 F.Supp. 1294, where the court held that a defendant's denial of *liability* under a stock purchase agreement, even if asserted in bad faith, does not constitute denial of the contract's *existence*. Thus, a recovery under *Seaman's* would not be permitted. The court referred to the expansive language in *Seaman's* regarding a defendant's "stonewall" position as dicta and merely a description of the new tort by analogy.[21] "In other words, bad faith denial of the existence of a contract is like

---

[21]As noted, we have previously expressed a similar view. (*Careau, supra,* 222 Cal.App.3d at pp. 1397-1398, fn. 22.)

stonewalling and goes beyond mere breach of a contract, *but the tortious conduct itself is the denial that the contract exists." (Id.* at p. 1296, italics added.)

These authorities stand for the proposition that the new tort of bad faith denial of contract existence should not be expansively construed to include *any* defense asserted to a contract claim. From a policy point of view, such a conclusion is both reasonable and appropriate. If the rule were otherwise then any party attempting to defend a disputed contract claim would risk, at the very least, exposure to the imposition of tort damages and an expensive and time-consuming expansion of the litigation into an inquiry as to the motives and state of mind of the breaching party. The distinction between tort and contract actions, and their purposefully different measures of damages, would be blurred if not erased. The insult to commercial predictability and certainty would only be exceeded by the increased burden on an already overworked judicial system.

Certainly, it would appear that these concerns are shared by our Supreme Court. In *Koehrer* v. *Superior Court* (1986) 181 Cal.App.3d 1155 [226 Cal.Rptr. 820], the appellate court had liberally characterized the meaning and effect of the decision in *Seaman's*. It recognized a tort remedy not for the employer's bad faith denial of the employment contract, but rather for the assertion, in bad faith and without probable cause, of a defense to *liability*. That is, that there was good cause for the employee's discharge.

This broad application of *Seaman's* was expressly criticized in *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*). "Despite the fact that we carefully limited our holding in *Seaman's* to instances in which a party 'seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists' [citation], the *Koehrer* court expansively concluded that 'If . . . the existence of good cause for discharge is asserted by the employer without probable cause and in bad faith, that is, without a good faith belief that good cause for discharge in fact exists, the employer has tortiously attempted to deprive the employee of the benefits of the agreement, and an action for breach of the implied covenant of good faith and fair dealing will lie.' [Citation.]" (*Foley, supra,* 47 Cal.3d at p. 688.) The Supreme Court concluded that, "*Koehrer* thus extended the expressly circumscribed cause of action established in *Seaman's* based on denial of the existence of the contract, to find a tort cause of action *when the dispute related to a contract term,* namely the necessity for good cause as a basis for termination. *By this broad stroke, made without analyzing the appropriateness of imposing tort remedies in the employment context, the Koehrer court broached the*

*possibility of obtaining tort damages for the breach of any term of a contract whether for employment or otherwise." (Id.* at pp. 688-689.) (Italics added.)

DuBarry seeks here to sustain a tort damage award which is founded upon the very expansion of *Seaman's* criticized by *Foley.* The three cases upon which he relies, however, simply do not justify such a result. In *Multiplex Ins. Agency, Inc.* v. *California Life Ins. Co.* (1987) 189 Cal.App.3d 925 [235 Cal.Rptr. 12], the court was faced with a claim for damages arising from the breach of an insurance commission agreement. The case was sent back to the trial court to determine if any basis for a tort recovery existed under *Seaman's.* The court, without analysis or citation of authority beyond *Seaman's,* held that the defendant insurance company might be liable in tort if it had denied "any liability 'in bad faith and without probable cause, that the contract exists' *or denied liability 'without probable cause and with no belief in the existence of a defense [stonewalling].'* " *(Id.,* at p. 939.) (Italics added.) However, this alternative theory has been seriously undercut, if not expressly rejected, by *Foley's* subsequent strong criticism of *Koehrer.*

DuBarry also cites *Rogoff* v. *Grabowski* (1988) 200 Cal.App.3d 624 [246 Cal.Rptr. 185, 1988 Cal.App. 383], which he claims stands for the proposition that the tort recognized by *Seaman's* "is based upon unreasonable conduct 'extraneous' to the contract, 'with the motive intentionally to frustrate the enjoyment of contract rights.' " The *Rogoff* court, of course, said no such thing. It merely noted that the *Seaman's* definition of its "new intentional tort" bore "striking similarities" to the language used in other cases (see, e.g., *Sawyer* v. *Bank of America* (1978) 83 Cal.App.3d 135, 139 [145 Cal.Rptr. 623]; *Khana* v. *Microdata Corp.* (1985) 170 Cal.App.3d 250, 263 [215 Cal.Rptr. 860]) thus intimating that it may be "a subset of, or one species of, the tort of breach of the implied covenant. [Citation.]" *(Rogoff* v. *Grabowski, supra,* 200 Cal.App.3d at pp. 629-630, fn. omitted.) However, both *Foley* (47 Cal.3d at pp. 688-689) and *Seaman's* (36 Cal.3d at p. 769) rejected any relationship between the *Seaman's* tort and a breach of the implied covenant of good faith. Moreover, DuBarry also neglects to acknowledge that *Foley* (47 Cal.3d at pp. 689, 698) found insufficient (as a definition of tortious misconduct in a contract dispute) the very language referred to in *Rogoff.*

Finally, DuBarry cites *Kittredge Sports Co.* v. *Superior Court* (1989) 213 Cal.App.3d 1045 [261 Cal.Rptr. 857], where a sporting goods retailer, in an action against the manufacturer for breach of an express indemnification agreement, was permitted to amend his complaint to add a cause of action for bad faith denial of the contractual liability. In ruling that the amendment

should be permitted, the court stated (at p. 1048) that it "is not at all clear an aggrieved party is limited to contract damages for a bad faith denial of contractual liability." This is another apparent, albeit very tentative, recognition of a possible expansion of the scope of the *Seaman's* tort, but it is likewise advanced without any analysis or authoritative support. *Kittridge* simply cited two cases, *Multiplex Ins. Agency Inc. v. California Life Ins. Co., supra,* 189 Cal.App.3d 925 and *Radell v. Comora* (Cal.App.).[22]

The necessary essence of DuBarry's argument is that a recovery in tort under *Seaman's* does not require evidence limited to denial of *contract existence*, but may rest upon evidence of the bad faith denial of *contract liability*. However, in our view, there simply is no credible authority for that proposition. A recognition of such a rule would not only offend important policy considerations and involve a voyage into "uncharted and potentially dangerous waters" (*Seaman's, supra,* 36 Cal.3d at p. 769), but also would fly in the face of the caution and concern expressed by the Supreme Court in *Foley, supra,* 47 Cal.3d at pages 688-689 when it criticized one lower court's efforts to expand the scope of the *Seaman's* tort.

We conclude from a review of the relevant authorities that the "new intentional tort" recognized by *Seaman's* is limited to the bad faith denial of the *existence* of the contract and cannot be extended to the assertion of other defenses to liability.[23] It is not hard to understand why DuBarry argues for

[22]*Radell,* involving a dispute between partners, noted that there was an apparent split of authority (between *Quigley v. Pet, Inc., supra,* 162 Cal.App.3d 877 and *Multiplex Ins. Agency, Inc. v. California Life Ins. Co., supra,* 189 Cal.App.3d 925) with respect to the scope of the *Seaman's* tort. *Radell,* after some discussion and analysis opted for the more liberal approach suggested by the conclusionary statement in *Multiplex* and recognized tort liability for bad faith assertion of different terms of "the contract." Indeed, *Radell* was the first case to attempt an analytical justification for an expansive construction of the *"Seaman's* tort." The Supreme Court ordered *Radell* depublished on September 21, 1989.

[23]That is not to say that the courts are without power to address the bad faith assertion of meritless or "stonewalling" defenses to contract claims. As the Supreme Court expressed it, in the different but not unrelated context of the *prosecution* of frivolous lawsuits, "the better means of addressing the problem of unjustified litigation is through the adoption of measures facilitating the speedy resolution of the initial lawsuit and authorizing the imposition of sanctions for frivolous or delaying conduct within that first action itself, rather than through an expansion of the opportunities for initiating one or more additional rounds of malicious prosecution litigation after the first action has been concluded. In recent years, the Legislature has taken several steps in this direction, enacting legislation to facilitate the early weeding out of patently meritless claims and to permit the imposition of sanctions in the initial lawsuit—against both litigants and attorneys—for frivolous or delaying conduct. (See, e.g., Code Civ. Proc., §§ 437c, 1038, 128.5, 409.3.)" (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 873-874 [254 Cal.Rptr. 336, 765 P.2d 498]; see also, *580 Folsom Associates v. Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 22, 25-28 [272 Cal.Rptr. 227];

such an expansion. As we now explain, the record demonstrates that, apart from an allegation in an answer, there was no evidence offered at trial of a denial by Southwest of the *existence* of his exclusive agency agreement.

### b. *The Evidence Was Insufficient to Support a Finding of Bad Faith Denial of Contract Existence*

 The *only* acts alleged by DuBarry as constituting a denial of the existence of the agency contract were (1) the statements made in a Southwest telex dated February 5, 1982[24] and (2) the denial contained in

---

*National Secretarial Service, Inc.* v. *Froehlich* (1989) 210 Cal.App.3d 510, 525 [258 Cal.Rptr. 506]; Putz & Klippen, *Commercial Bad Faith: Attorney Fees—Not Tort Liability—Is the Remedy for "Stonewalling"* (1987) 21 U.S.F. L.Rev. 419.)

[24]In paragraph 17 of the first amended complaint, DuBarry alleged, "On or about February 5, 1982, defendant Southwest, by telex, specifically denied the existence of the agency agreement between itself and plaintiff DuBarry . . . ." A copy of that telex was attached as an exhibit to that pleading. Because it clearly illustrates the extent of DuBarry's mischaracterization of Southwest's course of conduct, that telex is set forth in full here. It not only does not deny the existence of the agency agreement, it repeatedly confirms the *fact* of such relationship:

"At no time did Jim Russell, myself or anyone else at Southwest authorize you to make the specific offer to Castle and Cooke that you did in your letter of September 3, 1981, existence of which we did not become aware of until December 21, 1981. Jim Russell's Telex of September 3, 1981, to you required 'establishment of a contract within sixty (60) days.'

"Our meeting with you and my subsequent letter on November 20, 1981, outlined the basis we wished to proceed on. You indicated in your letter of December 15, 1981, that Castle and Cooke would only accept shipments to Gulfport with discounts of $30 to $20 per ton. I responded on December 16, 1981, that we could not proceed on this basis and hoped you could develop spot opportunities. You then made a final proposal to Castle and Cooke outlined in your letter of December 18, 1981, to Jim Russell that was consistent with my letter of November 20, 1981. We subsequently voided our two (2) year proposal when we did not receive acceptance by January 8, 1982. Consequently the only proposal we have to discuss with Castle and Cooke is for a five (5) year contract as outlined in my letter of November 20, 1981, and conveyed by you to Castle and Cooke on December 18, 1981. Of course in our meeting we would entertain and discuss proposals for spot tonnages or new proposals beneficial to both companies.

"You cannot possibly believe that Southwest Forest and Castle and Cooke feel they have any binding agreement with any vendor or customer until satisfactory contractual agreements have been negotiated and signed particularly with a contract of the [*sic*] magnitude. There are many points that have never been discussed and cannot be discussed on an arms length basis. We have given you adequate protection to ally [*sic*] any fears you my [*sic*] have that Southwest Forest will not work with you on this account. I cannot understand your continual reluctance in the past to allow us to meet with Castle and Cooke.

"I feel that the five (5) year agreement we have proposed will allow Castle and Cooke to have more favorable delivered costs to their plants than they can obtain otherwise. Please let Jim know if we should plan to visit with you and Castle and Cooke on Tuesday, February 9."

Southwest's answer to the original complaint.[25] Nonetheless, he relies in this appeal on other Southwest conduct which was presented to the jury. A review of each of these acts demonstrates that none of them, whether considered singly or together, amounts to a denial of the *existence* of the agency contract.

(1) DuBarry claims that Southwest, beginning about November 16, 1981, desired to avoid paying any commission to DuBarry. The first act of Southwest occurred on November 20, 1981, when Fallaw, on behalf of Southwest, insisted that he be present when DuBarry discussed offers with Castle & Cooke. DuBarry argues that Fallaw's apparent purpose was to try and cut DuBarry out of the picture.

(2) On February 2, 1982, Fallaw sent a telex to DuBarry which was sent to limit the scope of proposals to be submitted by him to Castle & Cooke. DuBarry contends that this was done to undermine his position and was part of Southwest's plan to deny him his commission rights.

(3) When DuBarry responded with a telex on February 2, 1982, seeking to remind Southwest that a broader authorization had been given to him, Fallaw sent another telex on February 3 stating:

"It is apparent to me that you are now and have since the start of our talks tried to push us into a position with Castle and Cooke that we are not now nor never were willing to accept."[26]

---

[25]In his original complaint, DuBarry alleged (in paragraphs 4 and 5) that (1) a telex from Southwest and (2) his reply thereto, both dated September 3, 1981, constituted the written exclusive agency agreement on which his action was based.

Southwest's answer to the complaint denied the allegations of "paragraphs 4 and 5, except admits that [the exhibit containing the copies of the said telexes attached to the complaint] is a true and correct copy of the original documents of which it purports to be a copy . . . ."

We treat separately DuBarry's claim that a pleading response could support tort liability assuming Southwest's answer actually constitutes a denial of contract existence.

[26]That something other than denial of contract existence is going on here is illustrated by the balance of this same telegram which DuBarry understandably has not emphasized in his brief:

"We are prepared to work with you exclusively on Castle and Cooke and to discuss with them and you a contract on the basis of my letter of Nov. 20, 81, and your acknowledgement based on your letter of December 18, as it relates to a 5-year contract. We are also willing to discuss spot sales.

"You should be aware that we have consulted with our legal dept. and they concur with our position.

"Pete, lets not loose sight on one thing—[Southwest], Castle and Cooke, and DuBarry Intl can all benefit if we are successful in negotiating a contract agreeable to all. That is what we want—I hope that is what you want. I sincerely believe you can be a big help to us with this account but we must sit down with them to discuss this."

Certainly, as of *February 11, 1982*, when he wrote the following letter to Fallow, DuBarry had apparently seen no evidence of the denial of the agency contract; nor did he then have any

(4) On February 5, 1982, Fallaw sent the telex which is set out in footnote 24. DuBarry claims that he "understood" that this was a disavowal and termination of his agency agreement. However, that is only an argumentative conclusion and is directly and repeatedly contradicted by DuBarry's subsequent correspondence and his participation in meetings when his status as Southwest's agent was obviously accepted and acknowledged (see, e.g., DuBarry's letter to Fallaw dated Feb. 11, 1982, set out in fn. 26). In any event, the telex of February 5, 1982 (see fn. 24), speaks for itself.

(5) DuBarry did not respond to the telex of February 5, but did attend a meeting between officers of Southwest and Castle & Cooke on February 9, 1982, at which the parties finalized the details of their agreement. DuBarry emphasizes some "notes" Fallaw wrote to himself during the meeting including one to "reduce [DuBarry's] commission." After this meeting, DuBarry claims that Southwest stalled on the final preparation of an agreement with Castle & Cooke and, despite DuBarry's efforts to hold it together, Castle & Cooke lost patience and terminated all further negotiations. DuBarry claims that Southwest scuttled the agreement with Castle & Cooke in order to avoid DuBarry's commission. Assuming all of this to be true, it does not provide any evidence of denial of contract existence. Indeed, it is evidence of the contrary.

The foregoing summary of DuBarry's case against Southwest, even giving it all the intendments that a favorable jury verdict requires, establishes nothing more than the fact that Southwest sought to avoid liability to DuBarry and possibly to Castle & Cooke if it accepted an offer submitted by DuBarry which, at least from its point of view, had not been authorized. Even assuming this was all done in bad faith, it amounts to something considerably less than a denial of the *existence* of the agency agreement with

"belief" or "understanding" that he had been terminated or that his agency contract had been disavowed. Because this letter is so inconsistent with DuBarry's *present* characterization of Southwest's actions during the same time period, we set it forth in full:

"Dear Mike:

"Just a note to thank you for the full support you gave me during our meeting of February 9, 1982, with Messrs. Cassity and Sink of Castle & Cooke. It is a pleasure representing your Company and I look forward to a mutually rewarding, long-term relationship with Southwest Forest Industries.

"Please advise me as soon as possible as to when I should reschedule the next meeting with Castle & Cooke in order to finalize a contract agreement. As you know, they want us to start shipping on April 1, 1982.

"Looking forward to the pleasure of hearing from you soon, I remain.

 "Sincerely yours

 "[/s/] A.P. DuBarry

 "A.P. DuBarry

 "President"

DuBarry. Whatever the state of the record with respect to Southwest's assertions regarding contract terms and performance, there is simply no substantial evidence that there was ever a *denial* by Southwest of the existence of the agency agreement.[27] As the Supreme Court stated in *Seaman's* and repeated in *Foley*, this new tort is of limited scope. It does not extend to the assertion of other defenses to liability.

As already mentioned, the only time that Southwest even purported to actually deny the agreement was in its answer to the original complaint. However, as we discuss below, such a pleading response cannot support a recovery in tort.

### c. *A Denial of an Agreement in a Pleading Cannot Serve as a Basis for Tort Liability*

This precise issue was addressed in *Lynch & Freytag v. Cooper* (1990) 218 Cal.App.3d 603 [267 Cal.Rptr. 189]. There, the court granted a summary judgment in favor of a sublessee on the claim of the sublessor that the sublessee had denied the existence of the lease agreement in bad faith. As here, the only evidence of such a denial was found in the sublessee's answer to the complaint. The court held that there could be no liability where the denial of contract existence occurred *solely* in the answer. Several reasons justify this conclusion.

First, in an ordinary commercial contract, as exists here, "there is no obligation to treat the plaintiff fairly outside the contract at issue [citation] . . . [and] subjecting defendant to tort liability would unreasonably impair the defendant's right to defend himself. [Citation.]" (218 Cal.App.3d at p. 612.) Second, as the court noted in *Palmer v. Ted Stevens Honda, Inc., supra,* 193 Cal.App.3d 530, "once litigation has commenced, the actions taken in its defense are not, in our view, probative of whether defendant in bad faith denied the contractual obligation prior to the lawsuit." (*Id.* at p. 539.)

Third, to permit a plaintiff to impose tort liability upon a defendant for positions asserted in pleadings not only imposes an unfair burden on the conduct of a defense but conflicts with the well-accepted rule which permits the assertion of two or more inconsistent pleas. Inconsistent defenses have

---

[27]DuBarry also argues that the tort claim can be sustained as a breach of the implied covenant of good faith and fair dealing, thus avoiding the need to prove that Southwest had denied the existence of the contract. Apart from the fact that this was not a claim advanced at trial, a recovery upon that theory would, at a minimum, require that there be a "special relationship" between DuBarry and Southwest. Even assuming that there is any remaining vitality to the concept of a tortious breach of the implied covenant in noninsurance cases (see *Foley, supra,* 47 Cal.3d at pp. 683, 692, 699-700), there clearly is no basis for finding the required special relationship in this patently commercial transaction. (*Careau, supra,* 222 Cal.App.3d at pp. 1398-1399, fn. 25.)

long been recognized and permitted in California. (*Shepard & Morgan* v. *Lee & Daniel, Inc.* (1982) 31 Cal.3d 256, 260-261 [182 Cal.Rptr. 351, 643 P.2d 968]; *Radinsky* v. *T.W. Thomas, Inc.* (1968) 264 Cal.App.2d 75, 77, 81 [70 Cal.Rptr. 150]; *Berger* v. *Steiner* (1945) 72 Cal.App.2d 208, 218 [164 P.2d 559]). If tort liability can follow the assertion of a particular defense then this right would be unduly impaired. (*Oki America, Inc.* v. *Microtech Intern Inc., supra,* 872 F.2d 312, 313-314.) A litigant should not be required to exercise a right of liberal pleading only at its peril.

Finally, "allowing a plaintiff to sue for 'bad faith' solely on the basis the answer to a complaint denies the existence of a contract would encourage multiple litigation: a suit by the plaintiff on the merits and, if that suit is successful, a suit for bad faith denial of contract. Of course, if the bad faith defense suit is unsuccessful, the defendant could then turn around and become a plaintiff in a malicious prosecution suit." (*Lynch & Freytag* v. *Cooper, supra,* 218 Cal.App.3d at p. 613.)

DuBarry argues that *Lynch* should not be followed because there the answer was unverified whereas here Southwest raised the denial of contract existence in a verified answer. There are two responses to that. First, a careful reading of *Lynch* fails to disclose whether the pleading involved was verified or unverified. Secondly, and more importantly, the court's analysis in no way depended or relied on the verification status of the pleadings. We find the reasoning of *Lynch* persuasive and reject DuBarry's argument that the fact of verification should justify such a gross interference with a litigant's liberal pleading rights.[28] In any event, the only limitation which verification imposes upon a pleader is to restrict the allegation of inconsistent *facts*. (*Steiner* v. *Rowley* (1950) 35 Cal.2d 713, 718-719 [221 P.2d 9].) It has no impact upon the allegation of inconsistent theories or defenses. An examination of Southwest's answer in this case (see fn. 25) demonstrates that it falls into the latter category.

d. *The Jury Was Not Properly Instructed*

Although in light of the dispositive nature of the foregoing it is not necessary for us to do so, we also note that the jury was not properly instructed on this issue.[29] We nonetheless consider the matter because it

---

[28]This is especially true here where the "verification" was made on behalf of a corporation by its counsel upon information and belief under Code of Civil Procedure section 446 (see fn. 6, *ante*).

[29]The record reflects that Souhwest did request instructions which more accurately stated the law but they were refused by the trial court in favor of the erroneous instructions actually given. Such request preserved the point on appeal. (See 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, §§ 240-243, at pp. 246-250.) However, the issue was not considered by the

illustrates the extent of the misapprehension by both DuBarry and the trial court as to the very limited scope of the tort recognized by the court in *Seaman's*. At the request of DuBarry, the trial court instructed the jury that in order to prove the claim of "bad faith denial of the existence" of the contract, DuBarry had to prove:

"1. That plaintiff and defendant entered into a contract;

"2. That defendant denied the existence of the contract *or denied that it was obligated to pay plaintiff a commission under the terms of the contract*;

"3. That defendant's denial was in bad faith;

"4. That the denial caused damage to plaintiff; and

"5. The nature and extent of plaintiff's damage." (Italics added.)

■ By this instruction, the jury was erroneously told that it could find liability if Southwest had denied that it was obligated to pay DuBarry's commission, irrespective of the basis of such denial.[30] It is not surprising

---

parties either in their briefs or at oral argument. Since it was not raised we would be free to ignore the issue, but we are not compelled to do so. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 480, pp. 471-472.)

[30]As part of the same instruction the jury was also told:

"To establish that defendant's denial was in 'bad faith,' plaintiff must prove two things:

"1. The first issue you must consider in reaching a verdict on DuBarry's claim for bad faith denial of the agency agreement is whether DuBarry has proved, by a preponderance of the evidence, that Southwest in fact denied the existence of that agreement.

"2. If you find that Southwest denied that it had an agency agreement with DuBarry, you must the determine if Southwest's denial was in bad faith.

"To establish that Southwest's denial was in bad faith, DuBarry must have proved, by a preponderance of the evidence, both:

"(a) that Southwest acted without reasonable cause in denying the existence of the contract; and

"(b) that Southwest acted dishonestly; that is, that Southwest denied the existence of the agency contract even though it believed that DuBarry was its agent.

"A mere breach of a contract is not, in itself, bad faith denial of a contract."

This additional part of the instruction did nothing to clear up the misdirection already given. The jury was already told that denial of contract *existence* could be established by evidence of a denial of contract *liability*. That the jury was confused was made apparent by a question which was submitted to the court during deliberations. The question read: "In the instructions on bad faith denial . . . , item 2 refers to denial of existence of a contract or denial of obligation to pay plaintiff a commission. Below that, subparagraphs 1), [*sic*] a), and b) refer only to denial of existence of a contract. Should this be taken to include the denial of

that the jury found this to be true. There was little doubt that such obligation was in serious dispute and Southwest clearly denied it was liable for any commissions. That is what the trial was about. The trial court, in failing to make a clear distinction between a denial of contract *existence* and a denial of contract *liability*, effectively gave DuBarry a hunting license to capitalize on every prelitigation action which Southwest may have taken (1) to limit and control the negotiating activities of DuBarry and (2) to avoid exposure to the risk of an unprofitable long-term contract with Castle & Cooke.

In short, the jury was permitted to find that Southwest was liable in tort in the absence of any admissible evidence that it had in fact ever denied the existence of DuBarry's agency contract. Such instruction was improper and, given the state of the evidence, was clearly prejudicial. "Generally speaking if it appears that error in giving an improper instruction was likely to mislead the jury and thus to become a factor in its verdict, it is prejudicial and ground for reversal. [Citation.]" (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670-671 [117 Cal.Rptr. 1, 527 P.2d 353].)

## CONCLUSION

For all of these reasons, we conclude that the judgment as rendered cannot stand. Duplicative damages have been awarded on DuBarry's tort cause of action and, in any event, there is no legal or factual basis for a tort recovery on the record before us. Therefore, the award of such duplicative compensatory damages, as well as the award of punitive damages, was improper. However, we need not remand the case for further proceedings. We can correct these errors by striking the duplicative compensatory damages and the entire punitive damage award. (Code Civ. Proc., § 43; and see 9 Witkin, Cal. Procedure, *supra*, Appeal, §§ 611-612, p. 597.)

## DISPOSITION

The judgment is modified by striking (1) the damages awarded ($1,502,604) for the cause of action for alleged bad faith denial of contract

---

the obligation as well, or is it strictly limited to denial of the *existence* of the contract." (Italics in the original.)

The court answered this question: "It is limited to denial of existence of the contract."

The court's answer, when read in light of the total instruction, was incomplete and, indeed, did not provide an adequate response to the jury's obvious confusion. It is not at all clear whether the court was referring to a limitation on the language in parts a) and b) which, by its terms, was applicable to proof of "bad faith" or was intended to correct the error in the earlier part of the instruction which outlined the five elements of the tort which DuBarry had to prove. In light of the evidence actually presented, which had demonstrated no actual denial of contract existence, the failure to give a clear and unambiguous instruction was crucial and highly prejudicial to Southwest.

and (2) the award of punitive damages ($3.8 million). As so modified, the judgment is affirmed. Each party shall bear its own costs.

Klein, P. J., concurred.

**HINZ, J.**—I dissent, except as to the affirmance of the judgment on the contract cause of action as to which I concur.

In addition I dissent from the order of publication and I dissent from the majority's refusal to dismiss the appeal.[1]

The majority's only apparent reason for refusing to dismiss the appeal and to thereafter publish the opinion is to discuss whether *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158], should be expanded.

Since, however, there is no need to reach this issue, there is no reason to publish the opinion and there is no reason not to dismiss the appeal pursuant to the stipulation of the parties.[2]

*Substantial Evidence Supports the Bad Faith Denial of the Contract*

The appellate court must examine the record to determine whether the evidence supports the jury's determination finding the bad faith denial of the contract.

There is evidence that Fallaw (Southwest's representative) repudiated the existence of the contract by denying DuBarry's authority to present the September 3d terms, even though Russell had conversations with Fallaw about the offer. After Castle & Cooke accepted the offer, Fallaw accused DuBarry of pushing Southwest "into a position with Castle and Cooke that *we* are not now nor *never were willing to accept.*" (Italics added.) Fallaw flatly denied DuBarry's authority to make the September 3d offer and asserted that Russell's telex to DuBarry on September 3, 1981, required the establishment of a contract in 60 days. There is evidence that Fallaw had

---

[1]The parties have settled this case and stipulated to dismiss the appeal.

[2]The majority discuss several other issues which are pure dicta.

They have concluded that there is no factual basis for a bad faith denial of the contract and yet they extensively discuss whether there were duplicate damages awarded for the breach of contract cause of action and the bad faith denial of a contract cause of action. See also their gratuitous comments concerning the bad faith and damage instructions.

We do not need a law review article or, for that matter, a defendant's primer, on a contrived issue. This is especially so, where the resolution of the issue has significant consequences. (See *Howard* v. *Drapkin* (1990) 222 Cal.App.3d 843 [271 Cal.Rptr. 893].)

been apprised of the offer and its renewal by both DuBarry and Russell. DuBarry felt that Fallaw was discrediting his integrity, and "my integrity is the way I make my living in this business." After an agreement was struck with Castle & Cooke, Fallaw denied there was an agreement, until finally Castle & Cooke declared its acceptance null and void due to the changes made by Fallaw to the original proposal and the delay in preparing the documents. Substantial evidence even though contradicted, supports the jury's findings. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

This was not the only evidence before the jury. In addition defendant's verified answer to the original complaint expressly denied the existence of the contract.

There was certainly substantial evidence before the jury to support its verdict.

The majority opinion brushes aside the evidence establishing the cause of action. The fact that the majority would have ruled for the defendant if they were the fact finder, does not justify the majority in rejecting the jury's resolutions of the disputed facts. Characterizing plaintiff's evidence as "only an argumentative conclusion" (maj. opn., *ante*, p. 574) does not invalidate the jury's verdict to the contrary.

The majority consistently disregard plaintiff's evidence presented to the jury by characterizing it as contentions, disputed, or allegations. These characterizations are not a substitute for viewing the record in accordance with settled principles of appellate review.

It is clear that the tort is not committed where the denial of the existence of the contract occurs *only* in the defendant's answer to a complaint. (*Lynch & Freytag* v. *Cooper* (1990) 218 Cal.App.3d 603 [267 Cal.Rptr. 189].)

However, the *Lynch* case does not apply to the case before us.

Defendant's denial of the existence of the contract in the answer[3] was not the *only* evidence of the denial as is amply demonstrated above.

The majority say there is no evidence of the bad faith denial of the contract at the outset and repeat it throughout their opinion, without

---

[3]The majority will not even concede that the answer denied the existence of the contract, although the defendant does not make this claim. They will only assume that defendant's answer "actually constitutes a denial of contract existence." (Maj. opn., *ante*, p. 573, fn. 25.)

analyzing the evidence before the jury. They point out conflicts in the evidence to discredit plaintiff's case ignoring the obligation to resolve conflicts in favor of the verdict. Every contested case has conflicts or it would not be tried in the first place.

The majority's view of the case is: "The trial court . . . effectively gave DuBarry a hunting license to capitalize on every prelitigation action which Southwest may have taken (1) to limit and control the negotiating activities of DuBarry and (2) to avoid exposure to the risk of an unprofitable long-term contract with Castle & Cooke." (Maj. opn., *ante*, p. 578.)

This is an amazing summary of the case in light of the fact that even the majority uphold damages in the amount of $1,502,604 because Southwest breached the contract.

The evidence establishes and the majority recognize that Southwest took prelitigation action to relieve itself from its obligations under the contract. Denying the existence of the contract was its primary "pre-litigation action."

*Substantial Evidence of Compensatory Damages*

Although the majority find there was no evidence to support the bad faith cause of action, they nevertheless discuss the damage award for this cause of action. This is pure dicta.

The parties agree that a plaintiff is not entitled to double recovery of the same damages. (See, e.g., *Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 760, fn. 13 [250 Cal.Rptr. 195].) Southwest contends that the jury award of $1,502,604 for damages for breach of contract and $1,502,604 for damages for bad faith denial of contract constitutes impermissible double recovery. Southwest also contends the award was speculative, asserting that the only evidence DuBarry presented on the amount of linerboard contracted for by Castle & Cooke was a statement that "[t]he first year's quantity should be approximately 20,000 [short] Tons with following years to be accelerated as C&C's volumes increase."

Substantial evidence supports the award as announced by the jury. The suggestion that a jury award of the identical amount on two different causes of action constituted double recovery rests upon speculation and is not supported by the record, even if the damages on both causes arose from lost

commissions.[4] If the verdict appeared to be improper, or even simply ambiguous, Southwest waived any challenge on that basis by failure to request timely clarification. (See *Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456, fn. 2 [72 Cal.Rptr. 217, 445 P.2d 881].)

Evidence of the contract terms, including quantities and Castle & Cooke's purchases during the five-year period, supports the jury's award.

The majority suggest that an explicit instruction that duplicate damages could not be awarded should have been given. If defendant wanted such an instruction, defendant should have requested it.

If defendant perceived any problem with the verdicts, defendant should have raised them before the jury was discharged. Defendant cannot sit idly by until after a time when the alleged error can be explored, and then complain for the first time.

The majority suggest that defendant raised the issue in a motion for a new trial. This is obviously too late.

*Punitive Damages*

The majority simply decline to discuss the amount of the punitive damages on the grounds that no tort cause of action was established by plaintiff. This conclusion did not apply to the matter of compensatory damages for the tort action. The majority state: "We note that this [compensatory damage] award would also fall for the reasons discussed below where we conclude that there was not substantial evidence that the alleged tort had even been committed." (Maj. opn., *ante*, p. 565, fn. 18.)

CONCLUSION

I respectfully dissent, except as to the affirmance of the judgment on the contract cause of action as to which I concur.

---

[4]In response to a jury inquiry, the trial court stated that damages for bad faith denial included loss of commission. This does not require the conclusion asserted by Southwest that "the jury's award must represent an award of the *same* lost commissions *twice* —an improper double recovery." (Italics added.) Nor is there merit to Southwest's contention that a speculation that the jury split the verdict would require reversal. *Shell v. Schmidt* (1954) 126 Cal.App.2d 279 [272 P.2d 82], relied upon by Southwest, reversed a verdict pursuant to erroneous instructions that it was permissible to split the total damages, which was prejudicial because nine of the separate verdicts were not sustainable. (*Id.*, at p. 294.)

In addition I dissent from the majority's refusal to dismiss the appeal pursuant to the parties' stipulation. I also dissent from the order of publication.