Filed 6/28/13  Allen v. Packer CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| PHILLIP ALLEN et al., | B238909 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. PC045774) |
| v. | |
| DAVID W. PACKER et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Melvin D. Sandvig, Judge.  Reversed as to punitive damages only; in all other respects affirmed.

Greenberg Traurig, Scott D. Bertzyk and Denise M. Mayo for Defendants and Appellants.

Drescher Law Firm and Robert E. Drescher for Plaintiffs and Respondents.

_____

Co-defendants David W. Packer and his wholly-owned limited liability corporation, HydroFuture, LLC (HydroFuture), were found in a three-day court trial to be liable to plaintiffs Phillip and Todd Allen for compensatory damages, punitive damages, interest and costs, totaling $135,361.04, based on causes of action for breach of a written contract, breaches of warranty, fraud, and negligent misrepresentation. We reverse the punitive damage award, and otherwise affirm the judgment.

## BACKGROUND[1]

Texas residents Phillip Allen and his brother Todd Allen became interested in the business possibilities of hydrogen-on-demand technology, a process for producing hydrogen from water, and injecting it into the fuel intake of diesel engines in order to increase engine power while reducing fuel consumption and exhaust emissions. Looking for a proven and marketable product, their internet research led them to seek further information about the dealership potential for the hydrogen-on-demand product of HydroFuture, LLC. Defendant David Packer responded by telephone to Phillip Allen's email inquiry in June 2008.[2]

Allen told Packer that they sought a product that was fully developed and ready to market in Texas. Packer repeatedly told him "'I have the goods. Our units are perfected'" and ready for market.

In August 2008, the Allens travelled to California to meet with Packer and see the HydroFuture products. Packer took them (and some other prospective HydroFuture dealers) to Robertson's Trucking, a sand and gravel facility, where they were shown a "HydroZilla" unit in operation on an idling truck. Packer told them that with the HydroZilla unit, the truck was getting increasing mileage, that they were "getting good reports back every day," and that after collecting just a little bit more information, he would be able to provide them with data that could be used for product sales.

---

[1] We state the facts consistent with the applicable standards of review, discussed below.

[2] Todd Allen did not testify. Further references to Allen are to Phillip Allen.

The gathering at Robertson's was followed by a restaurant dinner at which sales prospects were discussed with enthusiasm. Packer described the units' superior quality at length. In response to inquiries about HydroFuture's ability to respond to potential large-volume fleet sales, Packer represented that he could supply whatever volume was necessary—up to 2,000 HydroZilla units per day (or per week, Allen was unsure which). When Packer returned the Allens to their hotel later in the evening, he repeated his promise that the product was perfected and ready to be marketed. Allen testified that in his limited experience at that point, the product seemed to be "a durable unit, something that would work."

The Allens signed the HydroFuture dealer's agreement after returning to Texas; Packer testified that the parties signed the agreement in his presence before the Allens returned to Texas.[3] The agreement recited that it is effective as of August 17, 2008. It purports to be between HydroFuture, LLC, and an entity named HydroFuture of Texas, LLC, with the Allens signing as its officers. The agreement establishes HydroFuture of Texas, LLC as a non-exclusive dealer for HydroFuture products in the state of Texas.

The Allens had earlier formed an entity named Gas Busters, LLC, which Packer had agreed they could use for sales of HydroFuture units in Texas. For that reason, a provision of the agreement required the dealer to "use the name HydroFuture™ of (whatever area they are in)" on correspondence with potential buyers, but permits them to do business using their own DBA or corporate name (presumably Gas Busters, LLC). The equipment later shipped to the Allens pursuant to the agreement was invoiced and addressed to "Phillip Allen & Todd Allen, Gas Busters, LLC." And Packer provided the Allens with business cards that identified them as HydroFuture's Texas dealership, but did not use the HydroFuture of Texas, LLC name. No entity existed, or was ever formed, with the name "HydroFuture of Texas, LLC."

---

[3] The copy of the agreement admitted as an exhibit at trial does not bear Packer's signature.

An exhibit to the agreement described the "Hydro-Zilla Large Truck Booster Series 2 Electrolyzer System," and specified (in all capital letters) that the system "produces approximately 900 liters per hour," exhaust emissions are "at/or extremely near zero," and "fuel consumption can be down by 15% - 45%." Its list of the system's major components included the representation "NO MORE MISTER CHEMIST TO MAKE YOUR UNIT OPERATE PERFECTLY!" That sentence, with the word "perfectly," Allen testified, persuaded the Allens that the units were perfected and would work perfectly.

The agreement required that, as a HydroFuture dealer, the Allens must purchase three HydroZilla units (two to sell and one for demonstration), as well as some other specified equipment, at a total cost of $49,060.00, plus taxes and shipping charges. The Allens wired $52,773.11 to HydroFuture's bank on September 26, 2008, with the notation "for start up systems for Gas Busters business with HydroFuture.[4]

According to Allen, they did not receive the units when they paid the money. When Allen inquired about the units about a month later, Packer suggested that they pick up the units in California and receive training at the same time—promising that the units would be ready when they arrived. But when they arrived, the units were not ready. The Allens waited at a warehouse for eight or nine hours, watching while one unit was assembled from scratch.[5] They also spent a day in training at a sand and gravel facility, during which they "almost" finished installing one unit on a truck. They returned to Texas with the unit they had watched being built; their other two units they had ordered were shipped to them about a month and a half later. As it turned out, the units were not

---

[4] The dealership agreement provided that dealers were expected to meet a sales quota of 200 units in the first year. According to the HydroFuture unit price list and Allen's testimony, they could anticipate net profits of approximately $2,500 on each sale. These figures would yield approximate profits of $500,000 on sales of 200 units, and profits of $17,500,000 on sales for WalMart's 7,000-plus big-rig truck fleet.

[5] Packer testified that what the Allens had watched was not the unit being built—a process that takes 45 to 60 days—but only a upgrading of the unit's brackets.

the same as those they had been shown during their earlier visit to Robertson's Trucking. When they left California, none of the units were operational or had been tested.

Allen asked Packer for test data a number of times during the six months after they signed the dealership agreement. At first Packer replied that they did not yet have completed test results. After repeated requests he said that "the test results we're getting back . . . are wishy-washy. They're nothing that you can really show anybody to try to sell these units to."

Later, after Allen had pitched the product to WalMart for its fleet of over 7,000 trucks, Packer told Allen that the units of the version sold to the Allens were overheating and getting "inconsistent" test results, and that he was investigating other units that might be available from Taiwan. He referred to that version of the units as "green monsters," saying that they were building up green sludge inside. Packer told Allen nevertheless to go ahead with sales, and when it came time to install the units on trucks, "he would put the Taiwan units on there, and they would work okay." However the Allens felt they could not sell the units to truckers after being told the product does not work, and "without some kind of proof that what you're trying to sell them works."

By February 2009, Packer had provided the Allens no test data to support his representations about the products' performance, and had told them that the units did not work. After Packer refused their oral request for a refund, the Allens hired an attorney, who sent a letter terminating the dealership agreement and demanding a full refund. Packer's responsive letter refused to refund any money. It denied (among other things) having represented that the units were perfected. It also stated that the Allens knew from the outset that HydroFuture was about to come out with a new "4th generation" version, with a stainless steel core and different electrolyzers, which it would exchange for the Allens' units at no cost.[6]

---

[6] The units sold to the Allens used Pellegrino drinking water as the electrolyte. The newer version instead used sodium hydroxide.

In June 2009, the Allens filed suit against David W. Packer, HydroFuture, LLC, and doe defendants, alleging causes of action for breach of contract, fraud, negligent misrepresentation, and breach of the implied warranty of merchantability and of warranties under U.C.C. sections 2314 and 2315.  Their suit sought compensatory and exemplary damages, interest and costs.  Allen testified that in addition to their payment for the HydroZilla units and equipment, they lost anticipated lost profits of $2,500 or more per unit sold.

After a three-day bench trial, the trial court entered judgment in favor of the Allens and against Packer and HydroFuture, jointly and severally, for compensatory damages of $49,060 on the breach of contract and breach of warranty causes of action, for compensatory damages of $45,000 on the negligent misrepresentation cause of action, and for punitive damages of $25,000 on the fraud cause of action.  The defendants filed a timely appeal.

## DISCUSSION

In reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the respondent.  We accept as true all the evidence and reasonable inferences that support the trial court's decision, and resolve every conflict in favor of the judgment.  (*Garlock Sealing Technologies, LLC v. NAK Sealing Technologies* (2007) 148 Cal.App.4th 937, 951.)  """"It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact.  Our authority begins and ends with a determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, in support of the judgment."""  (*Ibid*.)  We view the evidence in the light most favorable to the verdict (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110), and we draw all reasonable inferences in favor of the prevailing party.  (*Crawford v. Southern Pacific Co*. (1935) 3 Cal.2d 427, 429.)

1. **The Allens Have Standing To Sue, And The Trial Court Did Not Err In Imposing Joint And Several Liability On Packer.**

Packer argues that the dealership agreement he and the Allens signed is an agreement between the then-nonexistent entity HydroFuture, LLC, and the nonexistent

6

entity HydroFuture of Texas, LLC, not between Packer and the Allens. As non-parties to the agreement, he argues, the Allens lack standing to sue for breach of the agreement or for misrepresentation or fraud in inducing them to sign it. (See *Berclain America Latina v. Baan Co.* (1999) 74 Cal.App.4th 401, 405 ["It is elementary that a party asserting a claim must have standing to do so. In asserting a claim based upon a contract, this generally requires the party to be a signatory to the contract, or to be an intended third party beneficiary"].) And he argues that the trial court had no authority to impose liability on him individually—a nonparty to the agreement—jointly and severally with HydroFuture, LLC. We conclude that neither of these points is well taken.

As with respect to other issues in this appeal, we presume the trial court's order to be correct and indulge all intendments and presumptions to support it regarding matters as to which the record is silent. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1416.) We affirm the superior court's express or implied determinations of disputed factual issues if substantial evidence supports them. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)

### a. The Allens have standing to sue.

Contrary to Packer's argument, the agreement itself provides ample support for the trial court's ruling, implied in its decision, that the Allens have standing as parties to the agreement. Packer fully understood that he was entering into a dealership agreement with the Allens, that they would become a dealer of HydroFuture products under the "HydroFuture of Texas" dealership name, with the freedom to use other business names and entities in the dealership's operation. That understanding of the written agreement was echoed in the parties' statements and conduct.

In the agreement, "Company" is identified as "HydroFuture LLC" (followed by a trademark symbol ($^{TM}$) and an address in Chatsworth, California). "Dealer" is identified as "HydroFuture Of Texas, LLC" (followed by an address in Carrollton, Texas).

The agreement requires "Dealer" to use the name "HydroFuture of (whatever area they are in)." It also provides that in correspondence with potential buyers "They [the

7

Dealer] may have their own DBA, Incorporation etc. [sic] in which all monies are used, with a different name other than HydroFuture." The plaintiffs' signatures on the agreement are followed by designated titles of president and vice president.

Allen testified that he and Packer discussed and agreed that the Allens would use "Gas Busters LLC" to market hydrogen-on-demand units, while the units would bear the HydroFuture name and the dealership would be identified as HydroFuture of Texas, as the agreement required. The HydroFuture invoice for their purchased units identifies the Allens and Gas Busters as the purchasers, and the purchase was paid with a Gas Busters' check. And Packer printed business cards for the Allens, identifying them as HydroFuture's Texas dealership (rather than "HydroFuture of Texas"). Allen testified that the understandings reflected in these facts explain why the Allens signed the agreement identifying the dealer as HydroFuture of Texas, a non-existent entity, "without a second thought."

This evidence supports the court's implied determination that the agreement was entered into by and on behalf of the Allens and their then-existing company Gas Busters, at least until their rights and obligations under the agreement were adopted by the yet-to-be-formed HydroFuture of Texas entity. The agreement authorized the Allens, as a HydroFuture dealer, to use a DBA of their own choosing, and specifically the Gas Busters entity. And Packer knew that it was the Allens and their DBA, Gas Busters, that was purchasing the units as the HydroFuture of Texas dealership.

HydroFuture of Texas, LLC, did not exist. It is the Allens who signed on its behalf, and who would have been responsible to Packer and HydroFuture for any breach. (*PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368, 1379-1380 [corporate directors are liable to those injured by their own tortious conduct regardless whether they acted on behalf of corporation, and regardless whether corporation is also liable]; *Shell Oil Co. v. Hanchett* (1936) 18 Cal.App.2d 240, 243 ["a promoter, though he may assume to act on behalf of a projected corporation and not for himself, . . . would be personally liable on his contract unless there was an agreement to look to the new company, when formed, for payment"].)

Packer accepted the Allens as HydroFuture's dealer in Texas, using the HydroFuture of Texas name.  He accepted the Allens' payment from their Gas Busters LLC.  His representations were made to the Allens, and his agreement was with them, not the nonexistent entity HydroFuture of Texas, LLC.  The Allens therefore have standing as plaintiffs.

### b.  The Trial Court Did Not Err In Imposing Joint And Several Liability On Packer.

The trial court's judgment imposed liability against Packer and HydroFuture, LLC, jointly and severally.  Packer contends on appeal, however, that the judgment against him personally must be set aside, because the trial court was unjustified in finding in its statement of decision that "HydroFuture, and Mr. Packer are one in the same."  The reasoning stated in the statement of decision, and the facts in the record, he contends, are insufficient to support a finding that HydroFuture LLC and Packer are alter egos of one another.  For much the same reasons that the Allens have standing in this case, we conclude that the trial court was justified in imposing liability jointly and severally on Packer.

A limited liability company, like a corporation, is an entity separate from its members or owners, who enjoy the same limited liability afforded to corporate shareholders.  (*PacLink Communications Int'l, Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 963.)  As with corporations, an LLC member may be liable for the LLC's obligations, along with the LLC, under the alter ego doctrine (although the grounds on which alter ego may be found are not in all circumstances the same).  (Corp. Code, § 17101, subd. (b).)

Under the alter ego doctrine, when the separate personality of the corporation is abused, "'it will be disregarded and the corporation looked at as a collection or association of individuals, so that the corporation will be liable for acts of the stockholders or the stockholders liable for acts done in the name of the corporation.' [Citation.]"  (*Mesler v. Bragg Management Co*. (1985) 39 Cal.3d 290, 300.)  In the absence of a finding of alter ego liability, a manager of an LLC is not personally liable

9

for the LLC's obligations; but like a corporate officer or director, a manager of an LLC may be personally liable to those harmed by his or her wrongful acts, even when they are done on the LLC's behalf. (*People v. Pacific Landmark* (2005) 129 Cal.App.4th 1203, 1212-1216; see *Mesler v. Bragg Management Co.*, *supra*, 39 Cal.3d at pp. 302-303 [affiliate's liability under alter ego doctrine is analogous to "liability of a principal for acts of a general agent"].)

This case does not require us to evaluate the record's ability to support an alter ego finding, however, because Packer—a named defendant—was the perpetrator of the wrongful conduct. (*Filet Menu, Inc. v. C.C.L. & G., Inc.* (2000) 79 Cal.App.4th 852, 866 [alter ego liability is superfluous when named defendant was wrongful conduct's perpetrator].)

When Packer induced the Allens to enter into the dealership agreement, obligating them (among other things) to purchase three HydroZilla units, HydroFuture, LLC, did not yet exist. When the Allens signed the dealership agreement and the agreement became effective, HydroFuture LLP was not a separate legal entity, but was merely a name that Packer used in his business.[7]

Doing business under a fictitious business name does not create a separate legal entity. (*Meller & Snyder v. R & T Properties, Inc.* (1998) 62 Cal.App.4th 1303, 1311; *Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, 1330.) The evidence was unquestionably sufficient to show that on and before August 17, 2008, the date of the dealership agreement, Packer was acting on his own behalf, although he was using the HydroFuture name.

The law is well settled that a promoter of a yet-to-be-formed entity can be held liable for the liabilities he incurred as the company's pre-formation promoter. (*Van*

---

[7] In pretrial discovery, Packer had denied that the dealership agreement was signed before HydroFuture LLP was established. But at trial he admitted that he filed the documents creating HydroFuture LLP on August 26, 2008, about 10 days after the dealership agreement's effective date. An exhibit to the Allens' complaint purports to be a document of the Secretary of State of California reflecting that on August 26, 2008, HydroFuture LLP filed as a California LLP.

*Duker v. Fritz* (1963) 222 Cal.App.2d 228, 230 [promoter of corporation yet to be formed is liable in quasi-contract for reasonable value of services requested by promoter].) When individuals incorporate in order to continue a business enterprise, they do not thereby escape liability for debts and obligations that they incurred in the name of the enterprise before its incorporation. (*Phillips, Spallas & Angstadt, LLP v. Fotouhi* (2011) 197 Cal.App.4th 1132, 1140, citing 9 Witkin, Summary of Cal. Law (10th ed. 2005) Corporations, § 16, p. 795.) The Allens plainly understood and agreed that Packer intended to do business under the name of HydroFuture LLP, and presumably that its status would be that of a limited liability company—just as Packer agreed that the Allens would do business as "Gas Busters LLP," using the name "HydroFuture of Texas" in their correspondence respecting the sale of HydroFuture products.[8] "'Upon the soundest reasoning, the tendency of the courts in recent years is to an adherence to the doctrine, that those dealing with promoters should be left with the double security of the promoter and the company when one is formed, unless it clearly appears that the liability of the promoter was not intended, or that it was intended to be released when the liability of the corporation began.'" (*Brisacher v. Baier* (1924) 67 Cal.App. 96, 101-102 [promoters are personally liable for contracts made by them preliminary to corporation's organization]; see also *Shell Oil Co. v. Hanchett*, *supra,* 18 Cal.App.2d at p. 243 ["a promoter, though he may assume to act on behalf of a projected corporation and not for himself, cannot be treated as an agent of the corporation, for it is not yet in existence; and he would be personally liable on his contract unless there was an agreement to look to the new company, when formed, for payment"]; *PMC, Inc. v. Kadisha*, *supra*, 78 Cal.App.4th at pp. 1379-1380 [corporate directors are liable to those injured by their own tortious conduct regardless whether they acted on behalf of corporation, and regardless whether

---

[8] The dealership agreement provides that "Dealer shall use the name HydroFuture™ of (whatever area they are in) when write letters [sic] and correspondence to potential buyers. They may have their own DBA, Incorporation, etc. in which all monies are used, with a different name other than HydroFuture™."

corporation is also liable].)  The trial court therefore did not err by imposing liability jointly and severally  on Packer.

2.  **The Record Reflects No Error In The Trial Court's Determination That The Units Sold To The Allens Did Not Work As Represented.**

Allen admitted that he and his brother did not test the three units they purchased from HydroFuture in order to determine the units' ability to function in conformity with Packer's oral and written representations.  According to Packer, without affirmative evidence of negative test results, the record is insufficient to support the court's findings of breach of contract, breach of warranty, negligent misrepresentation, and fraud.  We find no deficiency in the evidence.

According to Allen, Packer represented orally, and in the dealership agreement, that the HydroZilla units had been perfected, that they were ready for market without further development, that they would decrease fuel consumption by 15 to 45 percent, and that he had test data to support these claims.  Allen's testimony is corroborated by the invoice for the sale of the units to the Allens, which stated (in capital letters) that nothing further was needed "to make your unit operate perfectly."

When the Allens first came to California, Packer showed them a unit mounted on a truck, representing that the unit was getting good reports of increased mileage daily, and that he had data available for the dealerships to use for sales.  Another prospective dealer who was present at that demonstration testified that Packer had represented that the units were working great and were state-of-the-art, and that trucks using the units got great gas mileage.  He also said that Packer had represented that there was a 25 percent reduction in fuel usage.  That evening Packer repeated his representations to the Allens that the units had been perfected.

During the months after signing the dealership agreement Allen had asked Packer several times for test data.  At first, Packer had said he had no completed test results yet. In response to repeated requests, Packer had said that the test results they were getting are "wishy-washy," "nothing that you can really show anybody to try to sell these units to." Although Packer was asked many times for the test data, no written data was ever

12

provided. And in discovery, Packer formally admitted that as of a date almost two years after the agreement was signed, no working HydroZilla units had been installed on commercial vehicles.

According to Allen, Packer had told him that the HydroZilla units of the model purchased by the Allens were not functioning properly. In a telephone conference with the Allens after their purchase, Packer admitted that operation of the units resulted in buildup of green sludge, and that the units functioned inconsistently and were overheating. Another prospective purchaser gave corroborating testimony that Packer had admitted the buildup of sludge in the units, and that he had seen "rusty crud" in a unit that had been cut open. Edwin Ramirez, the person who built the units for HydroFuture (and who had assembled the Allens' HydroZilla unit in their presence), had told him that that version of the HydroZilla units was "no good."[9]

When Allen was asked why he did not independently test the units the Allens had purchased, he explained that they could not install and test the units on a truck without the owner's consent, which could be obtained only by providing test results or other indications of the unit's safety and benefits. "There's no way they're going to let me put [the unit] on their $100,000 rig without having some kind of proof or data or something." Packer had not provided the test data he had promised, and after the Allens were told by Packer that the units did not work, "that's all we needed to know."

Packer had admitted to Allen that the units did not work as he had represented they would, and that he could not provide the promised test data. That hearsay evidence was admissible as evidence of the truth of Packer's admissions. (Evid. Code, §§ 1220, 1235.) "Except where additional evidence is required by statute, the direct evidence of one witness . . . is sufficient for proof of any fact." (Evid. Code, § 411.) Under this rule, even if there had been nothing more, the trial court's findings of breach are fully supported by the evidence of Packer's admissions alone.

---

[9] Packer testified that Ramirez built or supervised building of the HydroFuture units, identifying him as an unpaid non-employee "partner" in HydroFuture, LLC.

13

### 3. Documentary Evidence of Product Testing Was Properly Excluded.

Packer contends that the trial court improperly excluded scientific evidence that would have shown that the units worked as represented. The trial court's exclusions of evidence are reviewed for abuse of discretion. (*Zhou v. Unisource Worldwide, Inc.* (2007) 157 Cal.App.4th 1471, 1476.)

Packer cites as error the exclusion from evidence of two documents: (1) the 34-page "Olson report," entitled "Final Report" of the Olson-EcoLogic Engine Testing Laboratories, LLC, dated March 15, 2010 (Revised March 26, 2010), and identified on its cover page as "Exhaust Emission Proof Testing for Exemption from the Prohibitions in Section 27156 of the California Vehicle Code" for Hydrofuture Hydrogen Generator and Injection Device; and (2) the "Robertson data," a five-page compilation of daily fuel-efficiency test data entitled "HydroFuture, LLC, MPG Data Collection, Data Summary, Robertson's Ready Mix."[10] According to Packer, the Olson report is "the only third-party test data offered by either side that scientifically measured" the hydrogen-on-demand units' "performance in reducing emissions"; and these two documents are the "two independent sources" that had "verified" his hydrogen-on-demand systems.[11]

The Olson report and its attachments purport to set forth the protocols for and results of testing done by Olson labs as of March 2010 (long after the Allens' dealership

---

[10] The date 6/21/10 appears at the bottom of the first of the Robertson data's pages. The date on each of the following four pages is partially obliterated, apparently victims of a three-hole punch. Packer's counsel offered to prove that the dates at the bottom of each page represented merely the date on which the spreadsheet document was printed, not the date the data was collected or the report was compiled. ~( 3 RT 292)~

[11] We use these shorthand titles for these documents because the parties do not identify them by their trial court exhibit numbers (nor do they cite in their briefs where in the record they can be found). Our search of the record indicates that the Olson report was marked Defendant's Exhibit A-15 ~(2 RT 233; 3 RT 371)~ (referred to as "the CARB report" regarding exemption by the California Air Resources Board of the HydroZilla units from the Vehicle Code's prohibitions on changes to vehicle exhaust emissions) ~(reproduced at Appellant's Appendix tab 25); and that "Robertson's data" is Defendant's Exhibit A-16. ~(reproduced at Appellant's Appendix tab 24. See 3 RT 287-288, 292, 371-373)~

agreement and purchase) certifying that there was no increase in exhaust emissions when HydroZilla units were tested on diesel engines—a certification that was required by the California Air Resources Board. However, the attached California Air Resources Board evaluation summary shows that the HydroZilla units on which the tests were done had stainless steel plates and used sodium hydroxide—characteristics that identify them as more recent versions than the units sold to the Allens. Although the Olson report indicated that use of the tested units did not increase (and in some cases may lower) exhaust emissions, the report did not address any impact on fuel use.

The Robertson data purports to set forth a comparison of beginning and ending odometer readings and fuel usage for a particular truck fitted with and without "HydroZilla Version 3," summarized on its first page and extrapolated over a five-year period. Notes to the Robertson data identify HydroZilla Version 3 as an "earlier model," and Version 8 as "our current version." Although no one testified to the meaning of the data, the earliest readings for the truck fitted with the HydroZilla unit appear to be from August 8, 2008, shortly before the effective date of the dealership agreement, but most of the data apparently relates to dates after the date of the dealership agreement. The earliest readings for the comparison truck without the HydroZilla unit appear to be from April 20, 2009, well after the date of the dealership agreement.

Packer testified that he gave the Robertson data document to the Allens, and that he discussed it with them first in August 2008, and "many times" thereafter. However, he had earlier testified that although he had test data when the Allens signed the agreement, he had never provided it to them (because "[h]e didn't ask"). And Allen testified that despite repeated requests, Packer provided no useable data verifying the units' performance.

The Olson report was discussed a number of times before and during the trial. Packer's trial witness list included an unidentified representative of the Olson laboratories. Packer's counsel told the court that "our experts are going to be a representative from the Olson Ecological Engineering Testing Laboratories, Edwin Ramirez." The court sought clarification: "So the expert that you're listing is the one

that did the testing at [the Olson labs]; right?" Counsel responded: "Right. A representative from Olson Ecologic Engine Testing, Edwin Ramirez." A few minutes later, however, Packer's counsel said that Packer would offer expert testimony from both Ramirez and an expert who would identify the Olson testing data.

The court ruled that it would consider the Allens' objection to Ramirez's testimony as an expert in a hearing under Evidence Code section 402, suggesting that even if Ramirez could not testify as an expert he might still be able to testify as a percipient witness (with which the Allens' counsel agreed). The court granted the motion to exclude the Olson test data provisionally, indicating that if the data turned out to represent tests on the same type of units as those the Allens purchased, "fine; then we'll go forward." The court also postponed considering whether an expert would be permitted to testify that the units tested were the same as those sold to the Allens.[12]

The admissibility of the Olson test data again arose when Allen testified that after seeing the Olson labs' information produced by Packer during discovery, he understood that it would be illegal for the Allens to install the units on a truck in Texas, or to advertise that the units were approved by the California Air Resources Board.[13] Allen's counsel sought to limit the inquiry, arguing that the court had already excluded the "testing done by Olson." But Packer's counsel disclaimed any intention to seek admission of the Olson test results, telling the court that she wanted only to have Allen identify "where in the report does it say" that advertising the units' approval would violate the law.[14]

---

[12] The Allens argued (among other things) that evidence of tests done after the units' sale to them would be irrelevant, and that the tests were apparently done on units different from those sold to the Allens. They moved also to exclude experts and documents not disclosed during discovery.

[13] Neither the record nor the briefs clarify exactly what documents Allen was referring to when he identified "the information that you all had sent us from the Olson labs" during discovery.

[14] The attached California Air Resources Board letter of April 15, 2010 encloses the board's executive order certifying the tested HydroZilla device's exemption, beginning

16

The trial court agreed that Allen could be examined on that issue. And it reaffirmed that Packer could offer evidence in his case-in-chief to impeach Allen's statements about the units' illegality. But neither the Olson report nor the Robertson data were offered into evidence at that time. This portion of the transcript therefore refutes Packer's contention that "with that, the court definitively excluded the empirical data on the Products' performance . . . ."

During a continuing discussion about various documents a short time later (not cited by Packer's opening brief), Packer's counsel offered to prove (apparently through Packer's testimony) that the Robertson data was the final version of a document to which Packer had routinely added information over the years, some unidentified portion of which information had been compiled and provided to the Allens when they purchased their HydroZilla units in 2008. Packer then cited Exhibit A-16, the Robertson data, as evidence that HydroFuture had data reflecting daily testing in 2008 "pertaining to the prior units" (apparently referring to units of the type sold to the Allens).

The trial court denied Packer's request at the close of the trial that Exhibit A-16 be admitted into evidence, primarily for lack of foundation. "Well, the court's going to exclude it primarily because look at all this beginning mileage, ending mileage, . . . unless Mr. Packer was driving the truck. There's got to be backup to this information. You have to have some kind of backup as to who was writing down this mileage and who was keeping track of the gallons."

Packer's counsel then advised the court that the exhibit was not being offered for the truth of its contents; it was offered only to prove "that the plaintiff did receive test data continuously on a continuous basis," as Packer had testified they had. "We request

that date, from the prohibitions of California law on advertising, sale, and use of the devices on certain kinds of trucks. The executive order specifies that "[n]o claim of any kind, such as 'Approved by the Air Resources Board,' may be made with respect to the action taken herein in any advertising or other oral or written communication," and that the CARB exemption "shall not apply to any HydroZilla device advertised, offered for sale, sold with, or installed on a motor vehicle prior to or concurrent with transfer to an ultimate purchaser."

17

that it be admitted for that purpose only."[15] The court then again denied Exhibit A-16's admission into evidence.

Packer offered nothing to show what portion (if any) of the Robertson data represented tests on HydroZilla units the same as those sold to the Allens; nothing to show who had collected and compiled the data, and for what purpose; and nothing to show what portions of the Robertson data had been provided to the Allens at any time, either before or after their entry into the dealership agreement and purchase of the units.[16]

The record shows no error in the trial court's rulings with respect to these exhibits. First, contrary to Packer's unsupported claim, the trial court did not exclude Defendant's Exhibit A-15, the Olson report with the attached letter and executive order of the California Air Resources Board. Defendant's Exhibit A-15 was received in evidence.

The court properly excluded the Robertson data, Defendants' Exhibit A-16. The record does not show that it contained anything relevant to the sole issue for which it was offered: to show that the Allens had received test data, either "continuously on a continuous basis, "or at all. Nothing in the document indicates that it, or any of its contents, was ever given to the Allens—before, during, or after the HydroFuture dealership agreement and the sale of units to the Allens. Without that, the document was not probative of the sole fact for which Packer had offered it: to show that the Allens had received test data "continuously on a continuous basis." Defendant's Exhibit A-16

---

[15] "[I]t goes to the state of mind of the parties. It is not hearsay. And it's not being offered for the actual data information because it requires expert testimony to decipher the data information."

[16] Packer's counsel had earlier told the court that the units sold to the Allens were not version 3. "Your Honor, first of all, this client didn't buy a version 3. We have no idea where he's coming up with this version 3. . . ." "There's no version 8. His unit is, I think, . . . version 4." Packer later admitted that he had told Allen (and confirmed in a letter) that HydroFuture would upgrade the Allens' units when the 4th generation HydroZilla unit, with a stainless steel core, became available. According to Packer, HydroZilla versions 3 and 4 used Pellegrino drinking water as an electrolyte, while version 8—the version tested for the CARB exemption—used sodium hydroxide.

therefore was not admissible.  (Evid. Code, § 350 [evidence must be relevant to be admissible].)

Nor does anything in the record provide a foundation sufficient to show the admissibility of the Robertson data for any purpose involving proof of the document's contents.  Packer testified that he had been involved in the testing for the data in Plaintiffs' Exhibit 1-13; but Packer offered nothing to show how, or by whom, the data in Defendants' Exhibit A-16 had been collected, compiled, and maintained; whether the data had been compiled and maintained in the ordinary course of someone's business; who had prepared the document in the form it was offered; for what purpose the document had been prepared; or even what portion of the data (if any) had been provided to the Allens before their revocation of the dealership agreement in February 2009.[17]  And even if the Robertson data had been offered for the truth of the document's contents, it constituted hearsay with no proof of the preliminary facts that would be required to show its admissibility (as a business record or official record, for example).  (Evid. Code,  §§ 405 [burden is proponent's to show preliminary facts support admissibility], 1271 admissibility of hearsay business record], 1280 [admissibility of hearsay official record].)

Finally, even if the Robertson data were relevant and admissible to establish the truth of its contents despite these defects, its exclusion from evidence could not have prejudiced Packer's defense.  Taken at face value, very little of the data was dated before the Allens' dealership transaction; therefore most of the data could not possibly have been provided before their entry into the agreement and purchase of the units.  Moreover, the trial court plainly believed Allen's testimony (and that of another prospective dealer, as well as Packer's own earlier testimony) that Packer had provided no test data.  The Robertson data does not contradict that conclusion in any way.  Therefore even if the

---

[17] Plaintiffs' Exhibit 1-13 was a chart entitled "09 Calculation Revision 2 12/08/08," purporting to be from the California Energy Commission showing the dollars to be saved over five and ten-year spans (ranging from $123,000,000 to over 4.3 billion dollars) if 7,200 trucks were to increase their mileage by amounts ranging from 5 percent to 110 percent.

19

Robertson data had been admitted into evidence, nothing in it could have influenced the court to believe that the data in it had been provided to the Allens at any time.

### 4. Plaintiffs' Claims Are Not Barred By The Terms Of The Written Contract.

Citing the dealership agreement's provisions setting deadlines for claims "for Product shortages or deficiencies" (30 days) and waiver of claims (10 days), Packer contends on appeal that when the Allens terminated the agreement in February 2009, it was too late for them to complain about the units' quality or performance. (Packer's briefs on this point do not mention the agreement's express warranty provisions.)

We decline to reach Packer's appeal on this point, or to consider the Allens' response on the merits.[18] Packer did not plead these defenses to the contract and warranty claims in his answer, nor did he raise them in the trial court. New and unpleaded defenses ordinarily may not be asserted for the first time on appeal. (*Doney v. Tambouratgis* (1979) 23 Cal.3d 91, 96-97; *Bardis v. Oates* (2004) 119 Cal.App.4th 1, 13, fn. 6; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2011) ¶ 8:231, p. 8-156.)

Nor can we say that the Allens would suffer no prejudice from Packer's untimely attempt to raise these issues. Had they been raised in the trial court, further proof bearing on them might have been presented, for example, concerning the parties' understanding and performance of their agreements or the prejudice (or lack thereof) resulting from the passage of the contract's time constraints. The failure to raise the issue below therefore has forfeited the contention that prosecution of the warranty claims pleaded in the complaint is precluded. (*Imperial Bank v. Pim Electric, Inc.* (1995) 33 Cal.App.4th 540, 546.)

We note in addition that all of the compensatory damages awarded by the judgment are supported by the breach of contract and negligent misrepresentation claims,

---

[18] The Allens' brief argues, among other things, that a contracting party is not absolved of liability for fraud in the contract's inducement by the agreement's recital of provisions foregoing reliance on representations. (*Manderville v. PCG&S Group, Inc.* (2007) 146 Cal.App.4th 1486, 1500-1501.)

without regard to the validity of any of the warranty claims, negating any possible prejudice to Packer resulting from the error he claims.

## 5. The Record Reflects No Impermissible Double Recovery Of Compensatory Damages.

The court awarded damages of $49,060—the amount the Allens had paid for the three units and related equipment, not including taxes and shipping—on the complaint's claims for breach of contract and breach of warranty (the first, fourth, fifth, and sixth causes of action). On the third cause of action for negligent misrepresentation the court awarded an additional $45,000 general damages. Packer's appeal argues that these compensatory damage awards reflect a failure by the trial court to require the Allens to elect a remedy, and that they embody an impermissible double recovery of compensatory damages.

The measure of damages for breach of contract is damages that would naturally arise from the breach, or which might have been reasonably contemplated or foreseen by the parties, at the time they contracted, as a probable result of the breach. (See Civ. Code, § 3300; *Walker v. Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 993.) The trial court was well within its discretion to award compensatory damages of $49,060 for the causes of action reflecting breach of the contract and its express and implied warranties. Packer does not argue otherwise.

Packer challenges the trial court's award of an additional $45,000 compensatory damages for negligent misrepresentation as duplicative of the contract-based damage award, arguing that the Allens were required to elect between damages based on contract and on tort, where both claims arose from the same conduct. The damages recoverable for misrepresentation include all the detriment caused thereby, whether anticipated or not. (Civ. Code, § 3333; *Gagne v. Bertran* (1954) 43 Cal.2d 481, 490, fn. 6; *Walker v. Signal Companies, Inc.*, *supra*, 84 Cal.App.3d at p. 993.)

The measure of damages for fraud in the sale of property is the amount of the plaintiffs' out-of-pocket losses, including, if the property was acquired for the purpose of reselling it at a profit, compensation for any reasonably anticipated loss of profits or gains

from the use or sale of the property if the property had possessed the characteristics fraudulently attributed to it. (Civ. Code, § 3343, subds. (a)(1), (a)(4).) However, plaintiffs may not recover in tort the same damages they have been awarded for breach of the contract; that would constitute impermissible duplicative damages. Because the Allens were awarded $49,060—the amount they paid Packer for the HydroZilla units— for breach of the agreement, Packer is correct that they are not entitled to again recover the units' purchase price on their claims for misrepresentation and fraud.

But that is not what the judgment awarded them. First, the evidence shows more than one transaction: one establishing the Allens as a HydroFuture dealer for the state of Texas; the other for the purchase of three HydroZilla units and related equipment. The $49,060 award reimburses the Allens for their payment for the HydroZilla units. But the $45,000 award for misrepresentation does not represent payment for the purchase; it is supported instead by evidence that the Allens had reasonable expectations of profiting from their dealership—from the sale of those units as well as additional units in the future. The evidence indicated that they reasonably anticipated receiving profits of roughly $2,500 per unit sold, and could reasonably anticipate selling about 200 units per year (the minimum sales the agreement required), indicating lost-profits of as much as $500,000. (If they were able to secure sales for any significant portion of WalMart's 7,200-truck fleet, as they were attempting to do, the profits might have been much higher.)

Packer relies heavily on cases such as *Walker v. Signal Companies, Inc.*, *supra*, 84 Cal.App.3d 982, and *DuBarry International, Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, for the proposition that "'[i]f a given state of facts entitles one to recover damages upon the theory of tort, and the same state of facts entitles him to recover upon the theory of contract, it would seem plain that recovery could not be twice had simply because the facts would support recovery upon either theory.'" (*DuBarry International, Inc. v. Southwest Forest Industries, Inc.*, *supra*, 231 Cal.App.3d at p. 564.)

The rule of those cases does not apply here. In those cases, the only damages shown by the evidence were the amounts awarded on the contract claims; nothing

22

remained to be awarded in tort.  (*Walker v. Signal Companies, Inc.*, *supra*, 84 Cal.App.3d at p. 996 ["When we search the record for some factual basis for the judgment based on fraud, we are unable to find any item not otherwise included within the compensatory award for breach of contract"]; *DuBarry International, Inc. v. Southwest Forest Industries, Inc.*, *supra*, 231 Cal.App.3d at p. 564 ["[I]in this case the *only* damage evidence offered related to lost commissions.  There was no attempt to show that Southwest's alleged [tortious conduct] had caused DuBarry any damages beyond those already claimed for the breach of that contract"].)  Here, unlike in those cases, the contract and tort awards are supported by evidence of recoverable damages that do not overlap.

The record reflects no double recovery of compensatory damages.  The trial court's award of $45,000 for Packer's misrepresentations, inducing them to enter into the HydroFuture dealership agreement, was not error.  (Civ. Code, § 3343, subds. (a)(4).)

**6. The Punitive Damage Award Is Unsupported.**

The trial court awarded punitive damages of $25,000 on the fraud cause of action.  Packer seeks reversal of the punitive damage award on two grounds:  First, the record lacks evidence of Packer's financial condition, a prerequisite to an award of punitive damages; second, the award of punitive damages for fraud is unsupported by actual fraud damages.  Because we conclude that Packer's first point is well taken, we reverse the punitive damage award without considering the merits of the second.

The Allens' failure to introduce evidence of Packer's wealth renders the punitive damage award unsupported, requiring its reversal.  An award of punitive damages must bear a reasonable relationship to the defendant's wealth.  A punitive damages award is excessive if it is disproportionate to the defendant's ability to pay.  (*Dumas v. Stocker* (1989) 213 Cal.App.3d 1262, 1267.)  For this reason, an award of punitive damages cannot be sustained on appeal unless the record contains meaningful evidence of the defendant's financial condition.  (*Adams v. Murakami* (1991) 54 Cal.3d 105, 112, 114-115.)  The law of California places the burden of producing that evidence on the plaintiff.  (*Id.* at p. 119.)  Here, however, there was no evidence of Packer's financial condition—

usually measured by his net worth—before, during, or after his transactions with the Allens, nor at the time of trial. (See *Zhadan v. Downtown Los Angeles Motor Distributors, Inc.* (1979) 100 Cal.App.3d 821, 839 [proper measure is net worth at time of trial].)[19]

The Allens contend that the record does contain evidence sufficient to constitute substantial evidence of Packer's financial condition: HydroFuture dealers were required to purchase a package of HydroZilla units for $49,060; the HydroFuture website listed nine HydroFuture dealers, and Packer had seven prospective dealers; the evidence therefore showed Packer had revenues of at least $500,000. On that basis they dispute that punitive damage award's reversal is required.

But evidence of gross revenues does not show financial condition. Without evidence of the expenses required to generate those revenues, and the assets or liabilities to which the revenues are to be added or subtracted, there is no way to determine how much the revenues will contribute to net worth. Even if Packer received revenues on the order of $500,000 from the sale of HydroZilla units, that evidence would not show how much he expended to build those units, or to pay other liabilities. Did the units he sold to the Allens cost him $500? $5,000? $50,000? The record is silent. Did Packer have millions of dollars of assets, or of liabilities? Neither the trial court nor this court is in any position to guess. (*Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064 [evidence of defendant's annual income is not meaningful evidence of financial condition sufficient to support punitive damage award ].)

Lacking evidence from which the trial court could approximate Packer's net worth at the time of trial, the record is insufficient to support the award of punitive damages in

---

[19] During her closing argument Packer's counsel argued to the court, "[r]egarding punitives, I believe the court must hear evidence of ability to pay and earning capabilities. There's been no evidence brought by the plaintiff regarding that." The court orally explained its decision to award punitive damages, saying "[T]here wasn't much testimony of [Packer's] ability to pay other than all of the dealers that he's testified he has contracts with. But in any event the court's going to award $25,000 punitive damages on the fraud . . . ."

any amount.  (*Kenly v. Ukegawa* (1993) 16 Cal.App.4th 49, 56, 58 [court cannot determine that any specific award of punitive damages is appropriate without evidence of defendants' actual total financial status, such as net worth].)  We therefore must set the punitive damage award aside.

### DISPOSITION

The judgment is reversed to the extent that it awards punitive damages of $25,000; in all other respects it is affirmed.  Respondents are entitled to costs on appeal.

NOT TO BE PUBLISHED.


CHANEY, J.

We concur:


ROTHSCHILD, Acting P. J.


JOHNSON, J.

25